**UNITED STATES of America,
Appellant**

v.

**Clifford A. JONES.**

**No. 22529.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 11, 1969.

Decided Sept. 30, 1970.

Mr. William S. Lynch, and Mr. Gerald E. McDowell, U. S. Dept. of Justice, Washington, D. C., with whom Mr. Fred M. Vinson, Jr., Asst. Atty. Gen., at the time the brief was filed, and Miss Beatrice Rosenberg, Atty., Department of Justice, were on the brief, for appellant.

Mr. Edward P. Morgan, Washington, D. C., with whom Messrs. Gerald S. Rourke and Thomas M. P. Christensen, Washington, D. C., were on the brief, for appellee.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge.

The United States takes this appeal (18 U.S.C. § 3731) from the District Court's grant, after an evidentiary hearing, of a pretrial motion to suppress evidence. As its opinion indicates, United States v. Jones, 292 F.Supp. 1001 (D.D.C.1968), the District Court relied in the first instance upon its reading of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), as invalidating under the Fourth Amendment all monitoring of conversations which has not been either expressly consented to by the objecting party or approved in advance by judicial authority. Secondarily, it was said that, even if Katz be held inapplicable where the witness-party to the conversation himself consents to the monitoring, the purported consent of such party in this case was involuntary. Alternatively, and over and above these constitutional considerations, the court invoked its supervisory powers to rebuke

what it regarded as overreaching by the Government "to import manufactured evidence into this case." For the reasons set forth hereinafter, we reverse.[1]

## I

The principals in this case came to the attention of the Government through their alleged involvement in what is commonly known as the "Bobby Baker Case."[2] Both appellee and Bromley, the prosecution witness central to the issues here involved, were known to have a long history of association with Baker. Consequently, both at various times were summoned to testify before a District of Columbia grand jury which was looking into the Baker matter. Bromley appeared twice, once in October, 1964, and subsequently on February 23, 1965. Bromley was subpoenaed for the second appearance because the Government was suspicious of the veracity of his original testimony. Bromley, an attorney himself, as are appellee and Baker, was apprehensive of the Government's renewed interest in him, and, in anticipation of his second grand jury appearance, retained an experienced criminal lawyer, Mark Sandground, to advise him.

Sandground immediately requested and received a postponement of Bromley's appearance, and met a number of times with the Justice Department attorneys who were conducting the investigation— Messrs. Moore and Bittman—in an attempt to ascertain the nature of Bromley's difficulties.[3] This elicited a disturbing response to the effect that Bromley was in danger of being prosecuted on a number of possible charges; and Bromley, upon Sandground's advice and despite the refusal of the prosecutors to promise immunity or make similar bargains, determined to cooperate, as the District Court found, "in the hope of some leniency along the way."[4]

Appellee was similarly a subject of the Government's interest. His name appeared with frequency in Baker's affairs, and he, too, was scheduled to testify before the "Baker Grand Jury." Appellee's testimony, given on March 17, 1965, conflicted with Bromley's. The latter had testified on his second appearance to receiving certain moneys from appellee as merely a conduit for their transmission to Baker. Appellee, contrarily, testified that the payments to Bromley represented legal fees for services rendered, and were for Bromley's account alone.

It was essential to Bromley that he show his version of the payments to be

1. Disposition of this case after submission was stayed pending the outcome of United States v. White, 405 F.2d 838 (7th Cir. 1969), cert. granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559 (1969); No. 46, argued November 10, 1969, restored to the calendar for reargument, January 19, 1970 (38 U.S.L.W. 3267). Since it has now become clear that the issues raised by the *White* appeal will not be settled until well into the 1970 Term, we deem it proper, especially in light of the substantial delay which has already occurred, to vacate the stay and proceed with our judgment on the merits. *Cf.* Baker v. United States, 139 U.S.App.D.C. 126, 430 F.2d 499, decided June 30, 1970.

2. Baker himself was tried and convicted of various counts of income tax evasion and conspiracy. His convictions have recently been affirmed by a panel of this court. *See* Note 1, *supra*.

3. The facts as recited herein are drawn from the District Court's Memorandum

Opinion where they are set more fully at pp. 1002–1006 of 292 F.Supp. They reflect the court's view of the evidence adduced at the pretrial hearing of the motion to suppress. The principal witnesses at that hearing were appellee, Bromley, Moore, and Sandground. The Government does not challenge in any particular the court's recital of the facts.

4. The District Court, after referring to repeated meetings between Bromley, Sandground, Moore, and Bittman, concludes this phase of its finding as follows:
   "At these and subsequent meetings between the Government lawyers and Bromley, no promise was ever made that if Bromley gave evidence against Baker he would not be prosecuted. When immunity was requested for Bromley it was not granted. But it is a fact that Bromley cooperated and that he was never indicted."

true, or he would be subject to liability for tax evasion. It was essential for the Government to show that appellee was aware of the falsity of his own grand jury statements in order to make out its perjury case. Appellee, knowing Bromley was scheduled to testify but apparently thinking that he had not appeared before the grand jury as yet, sought to transmit the nature of his own testimony to Bromley through the secretary of Fred Black, another Baker associate. This set in train the events which give rise to this appeal.

Appellee called Bromley on the night of March 12, 1965, following Bromley's representation to Black's secretary that he was "hurt" that appellee did not communicate with him directly. This call was not monitored, and Bromley's recollection of exactly what was said was hazy, although it appears that appellee did describe in detail the testimony given by him to the grand jury. Bromley immediately reported the call to Sandground, who concluded from Bromley's report that Bromley believed appellee was trying to influence him to tell a false story to the grand jury. In any event, Sandground promptly reported the incident in these terms to Moore and Bittman who saw in it the possibility that appellee, in addition to committing perjury, might be endeavoring to obstruct justice.

They now decided to ask Bromley, whom they had come to feel could be trusted, to participate in monitored conversations with appellee. They suggested a return call by Bromley to appellee, and arrangements were made with Bromley and Sandground to meet at Bromley's home later that night. Bromley, after consulting with Sandground, signed a written consent to the monitoring. Shortly after midnight, on the pretext of having been unable to talk freely earlier, Bromley called appellee, with a stenographer listening on an extension phone. During the course of this and later monitored conversations, Bromley actively encouraged, upon the prosecutor's instruction, appellee's mistaken impression that he (Bromley) had not yet testified before the grand jury, and invited guidance as to what his testimony should be. He did not challenge appellee's assertions as to the "right" representations to be made by Bromley to the grand jury.

In the following days further telephonic communications, relating chiefly to the arranging of a meeting in Los Angeles between appellee, Baker, and Bromley, were monitored with Bromley's written consent.[5] Bromley attended the Los Angeles meeting in a hotel suite with a Kel transmitter taped to his chest and with Government agents receiving and recording the transmission in neighboring hotel rooms. This was done with the express authorization of the Attorney General and Bromley's formal consent.[6]

For purposes of the motion to suppress, it was understood that Bromley would testify for the prosecution at trial. The transcripts of the monitored conversations would be offered in evidence to support his testimony.

## II

■ The opinion of the District Court, relying primarily on *Katz*, was issued prior to Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), in which the Supreme Court held that its decision in *Katz* was to be

---

5. An exception is the first call in this series. Appellee called Bromley one evening. There is some conflict in Bromley's and appellee's testimony as to what was said in this unmonitored conversation. Bromley said that appellee wanted him to set up a meeting between themselves and Baker to talk about what Bromley should say to the grand jury. Appellee says it was Bromley who proposed the meeting.

Sandground informed the prosecutors of the conversation on Bromley's behalf.

6. At the Government's request, Sandground accompanied Bromley to Los Angeles and was reimbursed by the Government for his travel and other expenses. Appellee paid Bromley's transportation expenses, as Bromley had asked him to do. Bromley's other expenses were reimbursed to him by the Government.

given wholly prospective application, that is to say, it would not bar evidence derived from electronic eavesdropping not involving a physical trespass and occurring before December 18, 1967. The eavesdropping here involved took place in 1965, some two years before *Katz.* The supervening effect of *Desist,* therefore, would necessarily appear to undermine the District Court's ruling to the extent that it rests upon *Katz.*

In a supplemental memorandum filed by leave of this court after *Desist* came down, appellee argues that it does not foreclose affirmance on this issue. It is said that, even without *Katz,* precedents prior thereto justify a decision in his favor. This is a dubious proposition at best,[7] and one made only more so by the Supreme Court's recognition in *Desist* that *Katz* represented "a clean break with the past." [8] Bereft of *Katz,* we do not understand that the District Court either would or could adhere to its prima-

ry ground of decision, at least so long as *Desist* survives, *see* Note 1 *supra.*

Furthermore, to the extent the argument is that the holding of *Katz,* which involved a monitoring of a telephone conversation neither known nor consented to by either party to the conversation, now be enlarged and extended so as to make the consent of appellee, as well as that of Bromley, essential to the propriety of the monitoring, we point to the approach adopted by the Court in De-Backer v. Brainard, 396 U.S. 28, 90 S. Ct. 163, 24 L.Ed.2d 148 (1969). There, the Court, faced with a request to extend a newly developed doctrine earlier determined to be non-retroactive, declined the request because the facts in question occurred prior to the cut-off date of the original decision.

It may be, as the District Court concluded, that the Supreme Court will one day make clear that *Katz* was intended to outlaw all monitoring of conversa-

---

7. Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), is asserted by appellee to be "ample authority" for this claim. But in *Silverman* the Court was dealing with the problem of physical trespass, and, as the Government points out, if *Silverman* has the force now attributed to it by appellee, it would have compelled a different result in *Desist.*

8. This court has recently dealt with Baker's argument that Bromley's testimony as to the monitored Los Angeles meeting should have been excluded because it was tantamount to introducing the logs themselves into evidence. Baker v. United States, Note 1, *supra.* We there said:
   "Assuming that the logs were used in court, Baker cannot object. The Supreme Court has held that it is constitutionally permissible to use monitored transcripts to substantiate the testimony of consenting informers who were parties to the conversations in question. Lopez v. United States, 373 U.S. 427, 438–440, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). * * *"
   The Supreme Court's disposition next term of *White* may, as we recognized in *Baker,* "shed further light on the continued validity" of *Lopez* in the light of *Katz,* although *White,* unlike *Lopez* and the case before us, involved testimony sole-

ly by the eavesdropping agents and not by the informer himself. That *Lopez-Katz* question has been the subject of some divergence among the circuits. The view we have expressed in *Baker* accords with that taken by the Second Circuit in United States v. Kaufer, 406 F.2d 550 (January 14, 1969), which was summarily affirmed by the Supreme Court by reference to *Desist.* Kaufer v. United States, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969), rehearing denied, 395 U.S. 917, 89 S.Ct. 1741, 23 L.Ed.2d 232 (1969). The Fifth Circuit has taken a similar position, most recently in Koran v. United States, 408 F.2d 1321 (January 27, 1969), cert. pending, 38 U.S.L.W. 3044. The Tenth Circuit has undergone some development of its views, the latest statement of which accepts the continuing force of *Lopez.* Holt v. United States, 404 F.2d 914 (1908), cert. denied, 393 U.S. 1086, 89 S.Ct. 872, 21 L.Ed.2d 779 (1969), rehearing denied, 394 U.S. 967, 89 S.Ct. 1303, 22 L.Ed.2d 570 (1969).
   For the admissibility of the logs of the telephone conversations, certainly absent *Katz, see* Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), and, more significantly, the post-*Katz* decision of the Supreme Court in Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968).

tions without prior judicial authorization where the objecting party did not consent. But that broader view of *Katz* must, *a fortiori*, be included within the non-retroactivity directed for *Katz* by *Desist*. Until that barrier is removed, if at all, by the court of last resort which constructed it, we do not see how the Government may be denied the benefit of it in this case.[9]

█ The District Court did, however, purport to find a foundation for its constitutional ruling which did not derive from *Katz*. This was its statement to the effect that Bromley's consent to the monitoring was involuntary. If that were true, *Katz*, narrowly or expansively read, would not be essential to a Fourth Amendment holding, although the District Court appeared to derive a new and higher standard for measuring consent from what it termed "the stringent, all-embracing constitutional prohibition of *Katz*."

We look only to what the concept of voluntariness has ordinarily been understood to involve in order to conclude that Bromley's repeated manifestations of consent were not nugatory in this instance. The District Court characterizes that consent as "coerced" by reason of the "constant presence of the Government representatives" and Bromley's fears of "indictment, loss of his job, and the eventual foreclosure of the mortgage on his home." This, so it is said, rendered the "wise, experienced advice of his attorney" merely a counsel "of necessity" which left Bromley "between Scylla and Charybdis, with no choice." Faced with these dismal prospects Bromley could not, says the court, "give that kind and degree of consent which might other-

wise be taken by some to justify an exception to be carved out of *Katz*."

Apart from this fashioning of a new test of consent by reference to a wide-ranging reading of *Katz*—something which arguably has also been banned by *Desist*—we do not find in the record the coercion discerned by the District Court. Bromley was not an illiterate or unworldly person. He had been moving in very sophisticated circles indeed and, as is not infrequently the case, this had gotten him into trouble. An attorney himself, he wisely put himself in the hands of a lawyer versed in that kind of trouble, and followed his advice. In any event, this advice appears to have saved Bromley from the very consequences characterized by the District Court as coercive. It is certainly true that people who testify falsely before grand juries do not find themselves in the happiest of conditions, and are under the necessity of taking thought for the future. But that hardly means that a decision to tell the truth and to cooperate with the authorities is thereby coerced or involuntary in any meaningful sense.

The same claim of Bromley's consensual involuntariness now made by appellee has also been made by Baker, the other participant in some of the monitored conversations. Baker's contention in this regard was rejected by the District Court in the first instance, and by this court on appeal. Baker v. United States, Note 1 *supra*. Our comment on the point was as follows:

"First, we do not agree with appellant's contention that Bromley was coerced into allowing the Government to monitor his conversations. Bromley's attorney was a former Government

---

9. In its post-*Desist* supplemental memorandum, appellee also argues that the District Court's decision may be sustained on the basis of Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). In *Gouled*, however, a warrantless search unknown to the defendant was carried out in his absence, and he became aware of the fact for the first time when he was confronted with the seized papers at trial. The conversations involved in this case, by contrast, were knowingly and directly carried on with Bromley. What appellee did not know was that Bromley was cooperating with the Government. We think Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), and Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), stand in the way of appellee's contention derived from *Gouled*.

prosecutor, and had advised his client to take the course of action which the attorney felt was least likely to result in a criminal prosecution of Bromley. The mere fact that Bromley allowed the monitoring in the hope that doing so would preclude a criminal prosecution does not of itself vitiate Bromley's consent to the monitoring."

### III

The District Court also purported to rely, in suppressing the transcripts in question, on the supervisory powers of the federal courts. Insofar as this approach is advanced or shaped by the previous finding of unconstitutional conduct, Part II of our opinion dissipates such support.[10] The court says, however, that it was not content to let matters rest on "constitutional principles," and we address ourselves to this aspect of its opinion as an independent ground of decision.

What we have said above with respect to the issue of the voluntariness of Bromley's consent is applicable here. In this part of its opinion the District Court reiterates its distaste for the actions of the prosecution in accepting and utilizing Bromley's offer of cooperation, and goes over much of the same ground as before in its strictures upon the monitoring operation. It characterizes the prosecution's effort as one to "import manufactured evidence" in order to satisfy the corroboration requirements in a perjury case. It is said that the Government's conduct "borders on entrapment," and that "the Government obviously overreaches" when it uses an informer

"who stoops to such deceitful conduct" *vis-a-vis* an acquaintance in order to "reinforce his own efforts to escape indictment. * * *" It is also seemingly critical of Bromley's lawyer for the role played by him in this incident, although elsewhere in its opinion the District Court referred to his "wise, experienced advice."

Although the court concedes that informers and their use are not illegal *per se*, it concludes that the Government goes too far in employing them in such manner as to cause the suspect to make revelations "to the Government's uninvited ear." *Hoffa* and *Lewis*, Note 8 *supra*, are put to one side because they do not involve electronic or telephone interceptions, which suggests that the District Court's concern is not with deceit as such, since all informing is deceptive, but only with the deceit which uses electronic surveillance to assure that the informer's version of the conversation is truthful and accurate.

What emerges from all this is that the District Court would view the intrusion of that "ear" in virtually all circumstances with the greatest distaste. It is not alone in this respect, and, indeed, finds itself in very respectable company indeed.[11] The question before us, however, is not whether electronic surveillance and wiretapping in the abstract are good or bad things, but whether the Government overstepped the bounds of what was lawfully available to prosecutors at the time of the events in question.

▮ The supervisory power doctrine is an extraordinary one which should be

---

10. In a footnote to this part of its opinion, 292 F.Supp. 1010 n. 8, the District Court undertakes to distinguish all the Supreme Court cases which might be thought to impose some restraint upon its exercise of supervisory power. It purports to do this in at least one important instance by referring to "the broad ruling in *Katz*." The later advent of *Desist* would appear to nullify the invocation of this kind of help.

11. *See* the separate dissenting opinions of Justice Holmes and Brandeis in Olmstead v. United States, 277 U.S. 438, 469–485, 48 S.Ct. 564, 72 L.Ed. 944 (1927). More recently, and in the new scientific context, an influential minority of the President's Commission on Law Enforcement and Administration of Justice were not prepared, on the information then available, to support electronic surveillance even on prior judicial authorization. *See* the Commission's Report, The Challenge of Crime in a Free Society (1967) p. 203.

"sparingly exercised," Lopez v. United States, 373 U.S. 427 at 440, 83 S.Ct. 1381, 10 L.Ed.2d 462 (Harlan, J.). As a threshold matter, exercising this power is perhaps questionable in these special circumstances when its effect would be to circumvent the import of the decision of the Supreme Court in *Desist*, a purpose not to be attributed, of course, to the District Court since *Desist* had not come down when it acted.

Furthermore, application of the doctrine requires a finding that the Government's conduct is outrageous in light of the surrounding circumstances of an individual case. It is clear from the record that appellee was neither an unlearned nor an uncounselled suspect.[12] Rather, the record is replete with indications that the prosecutors were dealing with suspects whose very sophistication created obstacles to the search for truth and the vindication of the public interest in law enforcement.

██ It may be that the dignity of our Government and its judicial system suffers when the United States employs an informer and uses what may be characterized as deceit in conducting a criminal investigation. It is also possible that the situation is exacerbated when the prosecution is for perjury, and the informer is a putative friend and coconspirator,[13] although the utility of any informer depends upon the trust which the suspect reposes in him. The enforcement of the criminal law is not, however, a mere sporting game, and the hunters, as well as the hunted, have their problems. In the case of the former, the use of an informer has long been, and still is, regarded as an available weapon in the arsenal; and we cannot see that the facts of Bromley's cooperation in this case cast the Government in any peculiarly villainous role. When, as we have found here, the actions complained of are neither unconstitutional nor beyond the bounds of what has been thought legally tolerable at this stage of our civilization, we deem it unnecessary to exercise the federal supervisory power to protect either the defendant or the processes of the trial court in the circumstances shown by this record.

The judgment appealed from is reversed, and the case is remanded for further proceedings consistent herewith.

It is so ordered.

BAZELON, Chief Judge:

I feel that there are troubling ambiguities with respect to the impact of Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 24 (1969), on the present case, but I am afraid that this court cannot resolve them until the Supreme Court has spoken to the issue again. I therefore concur in the result.

---

12. *Compare* McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

13. We note that the argument with respect to trickery and deceit advanced by defendant will be available at trial for the purpose of impeaching the credibility of the Government's witnesses.