**UNITED STATES of America,**
**Appellee,**

v.

**Edward J. FISCH, Ivan L. Glasscock,**
**Appellants.**

**Nos. 72-2007, 72-2068.**

United States Court of Appeals,
Ninth Circuit.

Feb. 16, 1973.

Certiorari Denied May 29, 1973.

See 93 S.Ct. 2742.

---

Edward V. Brennan (argued), of Ferris, Weatherford & Brennan, San Diego, Cal., Philip A. DeMassa (argued), San Diego, Cal., for appellants.

Thomas M. Coffin, Asst. U. S. Atty. (argued), Stephen G. Nelson, Asst. U. S. Atty., Harry D. Steward, U. S. Atty., San Diego, Cal., for appellee.

Before TRASK and CHOY, Circuit Judges, and TALBOT SMITH,* District Judge.

PER CURIAM:

The case before us involves eavesdropping, not by the use of electronics or artificial means, but in the traditional "listening at the keyhole" sense. The convicted defendants were in a motel room and the agents listened from an adjoining room as the operation was discussed. The principal argument of appellants is that their right of privacy was thus invaded.

The appellants were charged in a four count indictment with, count one, conspiring to import, count two, importing, count three, conspiring to possess with the intention of distributing, and count four, possessing with the intention of distributing approximately 70 pounds of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846, 952, 960 and 963. After trial to the Court, appellant Fisch was found guilty on all four counts, and appellant Glasscock on counts one, two and three, but not guilty on count four. The case below is reported sub nom. United States v. Perry, 339 F.Supp. 209 (S.D. Cal., 1972).

The *modus operandi* was somewhat unusual. The marijuana was dropped from an airplane onto an area west of Vulcan Mountain, near the Santa Ysabel Indian Reservation. The drop area was marked by flares. These flares were observed by a retired California Division of Forestry ranger, Mr. Tobin, who stopped to investigate. As he approached, he observed two cars nearby, and two men. One asked if he was from the garage. He answered that he was not and inquired as to their "problem." He was told they had a flat tire and trouble underneath the car. Unable to observe any flat, he took the license numbers of the cars, obtained the names of the men, Glasscock (appellant herein) and Thorpe, and suggested that they might obtain mechanical assistance at the Santa Ysabel Standard station. After telling them to extinguish the flares, he left the area. On the following day, September 24, this information was given to Deputy Sheriff Gene Cowley, of the San Diego County Sheriff's Office. At the same time Deputy Cowley received another report. This, from Wayne and Larry King, residents of the Santa Ysabel Indian Reservation, was delivered by one of the Santa Ysabel Mission Tribe, Anthony Taylor. The message was that a red and white airplane had been observed circling in the area of Vulcan Mountain and that it had dropped two objects during one of its passes. This had occurred at about the same time that Tobin had encountered the burning flares.

In patrolling the area of the aircraft drop immediately thereafter, Cowley observed the same Ford van previously described to him by Tobin travelling very slowly down the highway. The back end of the van was dirty and the license could not be read. A tail light was defective. Cowley stopped the van and asked the occupants (Glasscock and Thorpe) to produce identification. Indiana driver's licenses were produced, as well as a California registration, Glasscock stating that they had borrowed the van from a Sacramento friend, James Nash. As Cowley was running a name check on the occupants, he asked permission to check the van further, which was given by Glasscock, the driver. Under the right front seat Cowley observed an aerial navigation map. It was opened to expose the Julian Omni station on Vulcan Mountain, and on it a line had been drawn from the Vulcan site northwest, intersecting Highway 79 at the point of the suspected air drop, near where the van had been observed by Ranger Tobin on the previous evening. Upon the completion of the name check the van was released.

Later that day Cowley was informed that Larry and Wayne King, who had

---

* Honorable Talbot Smith, Senior District Judge, Eastern District of Michigan, Sitting by Designation.

observed the plane circling the day before, making the drop, had found a duffle bag containing 13 kilos of marijuana on top of Vulcan Mountain. This bag had been turned over to Border Patrol Agents in the area. Two days later a second duffle bag was found by the tribesman, Anthony Taylor. A few minutes after making the find Taylor encountered three unidentified males who told him they were there for fishing. He told them they were trespassing on Indian land and the bag was delivered to Deputy Cowley.

Again, on September 28, 1971, Deputy Cowley observed the Ford van parked off the highway near the area of the drop. No one was observed nearby but the engine was warm. Upon resuming patrol, he later observed the van on the highway. The license plate was still dirty and the tail light still defective. Glasscock showed Cowley a receipt for work done on the van and he was merely warned, not cited, upon his promise to make the necessary repairs. It was ascertained at this time also that the men were staying at the Holiday Inn Motel, Mission Valley. This information had been requested by Cowley's superiors and was transmitted to them.

Deputy Sheriff Perkins was then assigned to the Holiday Inn, Mission Valley. He learned from the motel clerk that Glasscock and Thorpe were registered in Room 514. Perkins requested an adjoining room but none was available, so he registered in 508. Upon the Deputy's request, and upon being informed that a smuggling investigation was underway, the motel clerk moved Glasscock and Thorpe to room 506 (adjacent to 508), upon the excuse that others had prior reservations on their room.

Aural surveillance was then begun. An attempt was made to use a suction cup electronic device but it was defective and nothing intelligible could be heard from it so its use was abandoned. All relevant conversations were heard by the naked ears of the officers. Some of the conversation was so loud that it was heard by an agent sitting on the bed in the middle of the room, specifically in part, the questioning of Fisch, the pilot, by Glasscock as to his speed when he made the drop. Other parts were heard by listening prone at the door, lying some six or eight inches away from a crack between door and carpet, leaving "room for your notebook to take notes." There was talk of drug usage, of the "specific deal," the problems they had had, the "trouble finding the stuff in the area" and how "they had been hassled by the Sheriffs in the area, and the Indians and the Ranger." Glasscock indicated that the next time "they were going to do a little bit more research into the area." He also telephoned one "Don" for help in locating the marijuana, arrangements being made for three more men to assist in the search. In short, there was ample disclosure and admission of the criminal smuggling operation then and there under execution. Arrests of the occupants of Room 506 were made immediately after the telephone call to "Don," and of the three men upon their arrival.

■ Against this overwhelming array of evidence, the appellants assert to us, as defendant Fisch puts it, that there has been a "gross invasion of privacy," or in the words of appellant Glasscock, a "sad and shocking disregard for appellant's constitutional right of privacy." In addition, complaint is made of the stop and search of the Ford van on the morning of the 24th, and of the information and evidence obtained as a result of the second stop of the Ford van on September 28. We will consider the vehicle questions before proceeding to the privacy issue.

On the morning of September 24, it was obvious that activities of a highly suspicious nature were underway. By this time the passes of the circling airplane were known to Cowley, the drops from the plane, the flares burning in the field, and the presence of Glasscock and Thorpe, with their non-observable flat tire. Consequently, when Cowley, patrolling in the area of the observed drop, encountered the same van as had Tobin

the day before, proceeding very slowly down the highway with its license plate obscured and a defective tail light, he was under a duty to stop the car. The occupants were questioned, identities sought to be established, names were obtained and a "name check" was made. While waiting for the results of the check, permission was asked and, the trial court found, granted to "look inside and check your van." The reason for the search was Cowley's reasonable unease about the situation presented. "The registered owner wasn't either occupant," he stated. "They were from Indiana. The van was registered in California, and they didn't have any written permission to have the vehicles, and I wanted to look further." The limited search made disclosed the aircraft navigation map marked as described above. When the "names came back checked all right" the men were released.

■ With respect to the stopping of the Ford van, the validity of the detentions and actions involved is governed by the State law, subject, of course, to constitutional standards. Wartson v. United States, 400 F.2d 25 (9th Cir. 1968), cert. denied 396 U.S. 892, 90 S.Ct. 184, 24 L.Ed.2d 166 (1969). The California Vehicle Code, § 2805, provides in part:

A member of the California Highway Patrol may inspect any vehicle . . . on a highway . . . for the purpose of locating stolen vehicles, investigating the title and registration of vehicles . . . [1]

■ Under the applicable state law, the validity of a temporary detention by a peace officer for investigation and questioning is summarized in the case of People v. Henze, 253 Cal.App.2d 986, 61 Cal.Rptr. 545 (1967). Required is a rational suspicion on the part of the officer that something out of the ordinary is taking place, that there is "some indication" to connect the person under suspicion with such activity, and, of course, that such activity is related to crime. The Federal constitutional standard is found in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The ultimate question for resolution in each instance is whether the action taken by the officer was appropriate, tested not by the hunch of the officer, seasoned though he may be, but by an objective standard, namely whether the facts available to the officer at the moment of the seizure (or search) would warrant a man of reasonable caution in the belief that the action taken was appropriate to the situation there presented.

Looking to both the State and the Federal standards, it is obvious that they have been amply met. Something unusual, suspicious indeed of criminal activity, was taking place in this area and Glasscock and Thorpe were involved in it. The stop and search of the Ford van was justifiable and lawful. All statements and evidence resulting from the detention were properly admissible.

We have discussed the above issues at some length in deference to the zeal of counsel. It should be observed, however, that we find nothing in the record that would warrant our reversal of the District Court's finding that Glasscock, in fact, consented to the limited search made.

■ We turn now to the second stop of the Ford van, that on September 28. By this time it was known that the packages dropped from the plane contained marijuana. Glasscock and Thorpe were still roaming around in the area with their fishing gear. Their vehicular defects were still uncorrected. Under the totality of the circumstances there was now probable cause for arrest. The most vigorous representation to us at this point is that the real reason for the stop was to obtain the local address of the suspects. Under these circumstances we are not disposed to weigh the motives of the officers, to categorize, as appellants would have us do, into princi-

---

1. This section of the Code has been held to apply to peace officers generally. People v. Brown, 4 Cal.App.3d 382, 84 Cal.Rptr. 390 (1970).

pal and secondary reasons for the stop, some of which are concededly good, others allegedly bad. There was in fact at this point reasonable grounds for further inquiry, questioning as to continued presence in the area, residence therein, reasons for not bringing the vehicle into compliance with the law, and other relevant and pertinent inquiries. There was nothing arbitrary, capricious, or unlawful in the officer's actions at this point. The holding in Wilson v. Porter, 361 F. 2d 412 (9th Cir. 1966), is peculiarly applicable at this point:

> We take it as settled that there is nothing ipso facto unconstitutional in the brief detention of citizens under circumstances not justifying an arrest, for purposes of limited inquiry in the course of routine police investigations. Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); Busby v. United States, 296 F.2d 328 (9th Cir. 1961). A line between reasonable detention for routine investigation and detention which could be characterized as capricious and arbitrary cannot neatly be drawn. But due regard for the practical necessities of effective law enforcement requires that the validity of brief, informal detention be recognized whenever it appears from the totality of the circumstances that the detaining officers could have had reasonable grounds for their action. A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing [361 F.2d at 415].

It is our conclusion, also, with respect to the second stop of the Ford van, that it was lawful and that all statements and any evidence obtained therefrom are admissible.

Coming now to privacy, there are several things this case is not, and it would be well to note them at this point. We have no telephone tap here. We have no bugging by electronic means. We have no trespass. The officers were exercising their investigative duties in a place where they had a right to be and they were relying upon their naked ears. So using their natural senses, they heard discussion of criminal acts. What was heard, however, was expressed by speakers who insist that they were justifiably relying upon their right of privacy, who sought to keep their conversation private, who "did not expect that law enforcement officers would be located just a few inches away from the crack below the door connecting the two adjoining rooms," and who thus conclude that "If one justifiably relies on his privacy any eavesdropping constitutes a search and seizure within the meaning of the Fourth Amendment."

It is true, as appellants point out, that Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), holds that "The Fourth Amendment protects people not places,"[2] but this is not a rule of decision. Actually it is the Court's expression of the rationale of decision, that the property concepts so long governing, substantially, decision as to unreasonable search no longer control. In short, this particular phrase, which is cited to us again and again, expresses little more than a rejection of the trespass rule. It does not tell us what people are protected, when they are protected, or why they are protected.

█ But it is clear from *Katz* that for suppression of overheard speech the speaker must have "justifiably relied"[3] on his privacy. As the concurring opinion of Mr. Justice Harlan makes clear, the concept of justifiable reliance involves both subjective and objective aspects. There must, first of all, have been a reliance on, an actual and reasonable expectation of, privacy. But beyond the individual's expectations, the needs of society are involved. The individual's subjective, self-centered expectation of privacy is not enough. We live in an organized society and the individu-

---

2. Katz v. United States, *supra*, at 351, 88 S.Ct. at 511.

3. *Id.*, at 353, 88 S.Ct. 507.

al's expectation of privacy must be justifiable, "one that society is prepared to recognize as 'reasonable.' "[4]

■ The statements before us fail of suppression on both aspects. As Mr. Justice Harlan points out, concurring, "[S]tatements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited."[5] Here the conversations complained of were audible by the naked ear in the next room. True the listening ear was at the keyhole, so to speak, but another listening ear was also, at one time, on the bed in the middle of the room, where was heard the pilot's story. Appellants would have us divide the listening room into privileged or burdened areas, and the conversation into degrees of audibility to, we presume, the normal ear, thus a remark heard on the bed arguably admissible, but not those heard at the door, a loud remark admissible, arguably one uttered in "normal" tones, but definitely not one whispered. We find no precedent for a categorization involving such hair-splitting distinctions and we are not disposed to create one.[6]

Listening at the door to conversations in the next room is not a neighborly or nice thing to do. It is not genteel. But so conceding we do not forget that we are dealing here with the "competitive enterprise of ferreting out crime."[7] The accomplishment of the move of the defendants' room to one more accessible for surveillance violated no constitutional right of the appellants.[8] They could,

had they wished, refused the transfer. The officers were in a room open to anyone who might care to rent. They were under no duty to warn the appellants to speak softly, to put them on notice that the officers were both watching and listening.[9] Their means of observation was not improper. In fact, they did not, with their naked ears, "intrude" upon the appellants at all. If intrusion there was it was, at times, the other way around, as anyone who has weathered the night in a motel room as the occupants next door partied and argued will bear ready witness.

The objection aspect of justifiable reliance, that the expectation be one recognized as reasonable by the current society,[10] bars the bizarre, the freakish, and the weird expectations. A recent perceptive study[11] poses the hypothetical of two narcotics peddlers who have chosen to rendezvous for an illegal transaction in a desolate corner of Central Park in the middle of the night and are surprised by a passing patrolman's haphazard illumination of their transaction. Their expectation of privacy was undoubtedly reasonable. Yet whether their expectation would be constitutionally enforced would depend upon the social considerations involved, or, in the words of Mr. Justice Harlan, whether "the expectation be one that society is prepared to recognize as 'reasonable.' "[12]

■ The test applied as to society's tolerance of the search rests, as it has for years, upon "the facts and circumstances—the total atmosphere of the

---

4. *Id.*, at 361, 88 S.Ct. at 516.

5. *Id.* See also, Ponce v. Craven, 409 F.2d 621 (9th Cir. 1969).

6. "[I]t would seem rather arbitrary to draw a constitutional line between the whisper and the shout." People v. Guerra, 21 Cal.App.3d 534, 98 Cal.Rptr. 627 (1971).

7. Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

8. "The enforcement of the criminal law is not, however, a mere sporting game, and the hunters, as well as the hunted, have their problems." United States v. Jones,

140 U.S.App.D.C. 70, 433 F.2d 1176 (1970), cert. denied 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971).

9. Pope, J., concurring in Smayda v. United States, 352 F.2d 251 (9th Cir. 1965).

10. Sometimes phrased as "reasonable and legitimate expectation of privacy," United States v. Missler, 414 F.2d 1293 (4th Cir. 1969).

11. "From Private Places to Personal Privacy: A Post-Katz Study of Fourth Amendment Protection," 43 N.Y.Univ.L. R. 968 (1968).

12. 389 U.S. at 361, 88 S.Ct. at 516.

case."[13] There is no ready formula, "each case is to be decided upon its own facts and circumstances."[14] What we undertake, actually, is a balancing process, a weighing of the social factors involved. Or, as Judge Duniway put it in the pre-*Katz* case of Smayda v. United States, 352 F.2d 251 (9th Cir. 1965), cert. denied 382 U.S. 981, 86 S.Ct. 555, 15 L.Ed.2d 471 (1966), "The public interest in its privacy, we think, must, to that extent, be subordinated to the public interest in law enforcement."[15]

■ Here, on the one hand, there is no doubt that society invests a hotel room, transient though its occupancy may be, with that special character of intimacy justifying its characterization as a private place. Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); Lanza v. New York, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), cited in United States v. Hitchcock, 467 F.2d 1107 (9th Cir. 1972). The "place," though its ownership or possession no longer controls, remains as an element for our consideration under the *Katz* ruling.[16] We consider, as well, the non-trespassory origin of the information received, the absence of artificial means of probing, with their potentialities for the wide-spread dissemination of total revelation,[17] the gravity of the offense involved,[18] here the smuggling of contraband. The type of information received from the aural surveillance is a factor to be considered in attempted delineation of the limits "of what society can accept given its interest in law enforcement," whether society can "reasonably be required to honor that expectation [of privacy] in all cases."[19] The degree of probable cause before us is high, there being reasonable cause for the police to believe that the room in question was being used in aid of a criminal venture.[20]

Upon balance, appraising the public and the private interests here involved, we are satisfied that the expectations of the defendants as to their privacy, even were such expectations to be considered reasonable despite their audible disclosures, must be subordinated to the public interest in law enforcement. In sum, there has been no justifiable reliance,[21]

13. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).

14. Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931).

15. See also Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), giving (in a search warrant situation) "full recognition to the competing public and private interests." See, also, State v. Smith, 37 N.J. 481, 181 A. 2d 761, cert. denied 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055 (1963), quoted in People v. Berutko, 71 Cal.2d 84, 77 Cal. Rptr. 217, 453 P.2d 721 (1969), "But it is the duty of a policeman to investigate, and *we cannot say that in striking a balance between the rights of the individual and the needs of law enforcement, the Fourth Amendment itself draws the blinds* [to the window] *the occupant could have drawn but did not*" (Italics 77 Cal.Rptr. 222, 453 P.2d 726).

16. "As the Court's opinion states, 'the Fourth Amendment protects people not places.' The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.'" 389 U.S. at 361, 88 S.Ct. at 516, Harlan, J., concurring.

17. See Fried, "Privacy," 77 Yale L.J. 475 (1968).

18. Remington, "Criminal Justice Administration," 73, "Each of the methods which police may use in collecting evidence of crime has its own problems—problems of effectiveness, of intrusiveness, of interference with innocent people, of susceptibility to regulation. The seriousness of the criminal conduct may affect the degree to which people will tolerate intrusive detection techniques."

19. 82 Harv.L.R. 63 (1968).

20. Cf., Smayda v. United States, *supra*.

21. Katz v. United States, *supra*, 389 U.S. at 353, 88 S.Ct. 507.

the expectation of privacy not being "one that society is prepared to recognize as 'reasonable.' " [22]

Affirmed.

---

22. *Id.,* at 361, 88 S.Ct., at 516, Harlan, J., concurring.