THE STATE OF OHIO, APPELLANT, *v.* DAY ET AL., APPELLEES.

[Cite as State v. Day (1976), 50 Ohio App. 2d 315.]

(No. C-76480—Decided December 20, 1976.)

*Mr. Simon L. Leis, Jr., Mr. William E. Breyer* and *Mr. William P. Whalen, Jr.,* for appellant.

*Mr. Bernard J. Gilday, Jr.,* for appellees Conley Day, William Patrick Barum, Vernon Lee Tiedge and Susan M. Schultz.

*Mr. Allen Brown* and *Mr. William Whitaker,* for appellees Michael Richard Penrod and James Paul Powers.

*Mr. Henry Sheldon,* for appellee Richard G. Wells.

*Mr. Philip E. Pitzer,* for appellee Anthony Carl Andres.

PALMER, J. On March 16, 1976, an indictment was returned charging the defendant, appellees herein, with maintaining a criminal syndicate for illegal trafficking in drugs, a violation of R. C. 2923.04, and with possession for sale of an hallucinogen, a violation of R. C. 3719.40 *et seq.* and R. C. 3719.44(B). Motions to suppress evidence seized by law enforcement officers, allegedly in violation of rights se-

cured by the Constitution of the United States and of the State of Ohio, were filed and, at the conclusion of an extended evidentiary hearing, were granted by the trial court. This court then granted plaintiff leave to appeal with one assignment of error presented for review: whether the trial court erred in granting the defendants' motions to suppress.

A review of the transcript of the hearing on the motions to suppress reveals that the assistant manager of the Ramada Inn, a motel located in Hamilton County, Ohio, called the police of the city of Blue Ash in the late afternoon of February 10, 1976, and reported that one of the guests of the Inn, the appellee William Barum, registered in Room 120, was exciting concern because of an excessive number of incoming calls to Room 120, together with outgoing long distance calls; because of a parade of poorly dressed and bearded young people going to and from Barum's room; and because of the sizable food and bar bills run up by Barum. Chief Sturgill and Officer Stevens of the Blue Ash police responded promptly to this call and the assistant manager again related the foregoing to them. At the request of the two officers, whose suspicions of illegal activities were aroused by this recital, the assistant manager then conducted the two officers to Room 118, which adjoined Barum's room, unlocked the door of Room 118 for them, admitted them to the vacant room, and then left. Stevens stated that the motivation was to discover if, as they suspected, illegal activities were being conducted in Room 120 by its occupants and guests.

Stevens sat on the edge of a couch near the common wall between the two rooms where he could hear muffled voices from Room 120 but could not distinguish words. Chief Sturgill, stating to Stevens that "I can hear better over here," lay down on the floor with his ear near the locked door on the common wall communicating between Rooms 118 and 120.[1] It is uncontroverted that at no time was any

---

[1]Actually, there were *two* doors, back to back, each locked from the room into which the door opened.

electronic, mechanical or other listening device, except the unaided human ear, used by either officer. Nor were the common doors opened or the interior of Room 120 invaded in any physical sense until the two officers later made the arrests in question. Chief Sturgill, while in the posture described above, overheard a number of conversations, both on the telephone and between persons present or arriving in Room 120, during which were conversations referring to a boat trip bringing marijuana and to the quality of a product which the officer suspected was marijuana contained within the room. Parties in the room were overheard to say: "This is the quality of the marijuana before we process" and "this is the condition of it after we remove the stems and seeds and clean it up." Stevens, after he moved closer to the door, overheard a male voice asking about quality and a female voice respond that it was very good quality, running from gold to deep red and "high grade," references which the officer understood from experience referred to the quality of marijuana.

At one point during the vigil, Chief Sturgill sent Stevens out to the motel lobby to phone for reinforcements. Although there was a phone in Room 118, the officers hesitated to use it, concluding that if they could overhear what occurred in Room 120, the people in Room 120 could similarly overhear them. As Stevens left Room 118, he saw defendants Penrod and Powers leaving Room 120; as he returned from the lobby, he saw an individual later identified as defendant Barum leaving Room 120 carrying a large square, clear plastic package. As Stevens returned, Chief Sturgill was in the process of leaving Room 118, having in the meantime overheard a male voice from Room 120 saying to someone on the phone: "Something is wrong. We have to get out of here!" Both officers, apprehending the likelihood of immediate flight, then approached the entrance door to Room 120; whereupon, a woman inside the room hurriedly closed the partially opened door, but before she did so, Stevens saw a quantity of what he recognized as marijuana on the bed. Sturgill than knocked on the door, identifying himself as a police officer, and the woman open-

ed the door and admitted the officers. Arrests of the occupants of Room 120, and others, followed, together with the seizure from the room of a quantity of material, including a very substantial quantity of marijuana in various packagings, weight scales, etc. Later that night, officers observed, through the rear window, additional marijuana in a locked Volvo automobile parked in the Ramada Inn parking lot and seized therefrom a substantial amount of cash and additional marijuana packaged in a manner similar to that seen earlier in the possession of Barum as he left Room 120. Subsequently, search warrants were secured which resulted in the seizure of additional evidence.

All of the testimony adduced at the hearing on the motions to suppress was presented by the state's witnesses, the police and the assistant manager of the motel. The defendants did not testify, nor offer evidence on their behalf. The trial court, directing its attention to the police activities in Room 118, concluded that the police surveillance of Room 120 constituted a warrantless search without probable cause and was therefore illegal. It suppressed all evidence directly and consequentially seized as a result of such search.

While it is apparent that the constitutional issue raised by this appeal is not free from difficulty and even some conflict of authority, we have concluded after a review of the cases cited to us that the trial court erred in its suppression of the evidence seized in Room 120, as well as its suppression of the other derivative evidence as "fruit of the poisonous tree."[2] Defendants' position here, as in the trial court, begins on the foundation of *Katz v. United States* (1967), 389 U. S. 347, a case involving the electronic

[2] We are not called upon nor do we here decide any issue of search and seizure other than passed upon by the trial court, *viz.*, the legality of the search of Room 120 and seizure of evidence therein, and the consequent inapplicability of *Silverthorne Lumber Co.* v. *United States* (1920), 251 U. S. 385, to work a suppression of evidence derivatively seized. Additional errors or deficiencies in procedure, if any, with respect to the seizure of evidence other than that contained in Room 120 are not presented for decision in this appeal.

surveillance by F. B. I. agents of a telephone booth where the petitioner was making an interstate call. Holding that the eavesdropping activities violated the privacy upon which the petitioner relied while using the booth, and thus constituted a Fourth Amendment search and seizure, the Supreme Court observed that the Fourth Amendment protects people rather than places and is not restricted to instances of physical intrusion into a protected enclosure. It stated, at 359:

"The government agents here ignored 'the procedure of the antecedent justification * * * that is central to the Fourth Amendment' [i. e., advance authorization by a magistrate upon a showing of probable cause]* * *, a procedure that we hold to be a constitutional precondition of the kind of electronic surveillance involved in this case."

However, to extend the doctrine of *Katz* to the instant case requires an examination and appraisal of the effect of two obvious factual differences: first, the *Katz* decision involved electronic eavesdropping, a circumstance Justice Stewart, speaking for the majority, was careful to preserve, and second, the difference, if any, in the constitutionally protected expectation of privacy of one in a phone booth making a telephone call from one carrying on a conversation in a motel room.

Our examination of these differences should begin first with the observation that in the matter *sub judice* the officers clearly had every right to occupy Room 118. This is not the case of government agents occupying space for surveillance where they had no right to be. Here, the two officers were invited and admitted by the agent of the Inn to occupy the room where they made their surveillance, and did so with the consent of the owner.

Next, we note that it is beyond argument that a hotel or motel room is, like a home, an auto, or an office, an enclosure within the Fourth Amendment protection against unreasonable searches and seizures. *Stoner* v. *California* (1964), 376 U. S. 483; *Hoffa* v. *United States* (1966), 385 U. S. 293. It is clearly unreasonable and illegal, absent one of the recognized exceptional circumstances which will

justify a warrantless search, to break down a motel room
door to search for and seize evidence of criminal activity,
but can it be said to be so clearly illegal for government
agents, lawfully on the premises, to use their ears to over-
hear what is being said in an adjoining motel room? Or,
phrasing the question within the *Katz* rationale, does one
have a reasonable expectation of privacy when occupying
a motel room which is capable of constitutional protection
as against the eavesdropping ears of police officers in an
adjoining room? We would have no problem answering
this question in the affirmative had the officers, like the
agents in *Katz,* used electronic or mechanical devices to
assist their surveillance.[3] We believe that the occupants of
motel rooms, like the occupants of a phone booth, may rea-
sonably expect that the privacy of their conversations will
not be violated by the warrantless intrusion of electronic or
mechanical means of surveillance. We do not believe that
the occupants of such rooms have any right to expect that
their normal conversations may not be overheard by listen-
ing ears in the next room, or that the privacy of their con-
versation will be constitutionally protected from such pur-
poseful or inadvertent auditors. To hold otherwise is to
defy the experience of any seasoned traveller familiar with
troubled nights and fitful sleep occasioned by the unwel-
come loquaciousness of his thoughtless neighbors. If one
zealously treasures the privacy of his utterances from

---

[3]We agree with the dissenting opinion of Mr. Justice Brennan, in
*Lopez* v. *United States* (1963), 373 U. S. 427, cited with approval in
*Katz* v. *United States, supra,* at 356 n. 17, 358 n. 22, that:

"* * *[T]here is a qualitative difference between electronic surveil-
lance * * * and conventional police stratagems such as eavesdropping and
disguise. The latter do not seriously intrude upon the right of privacy.
The risk of being overheard by an eavesdropper or betrayed by an in-
former or deceived as to the identity of one with whom one deals is
probably inherent in the conditions of human society. It is the kind
of risk we necessarily assume whenever we speak. But as soon as
electronic surveillance comes into play, the risk changes crucially.
There is no security from that kind of eavesdropping, no way of miti-
gating the risk, and so not even a residue of true privacy." *Lopez* v.
*United States, supra,* at 465.

auditing by the curious, the prurient, or the official, common experience would dictate avoidance of the motel room.

Indeed, we believe it to be indisputable, and at least some among the several counsel for the defendants do not strenuously resist the proposition, that had the officers here, while standing in the middle of Room 118 or perhaps even sitting on the furniture provided in the room, overheard a conversation from Room 120 which gave them probable cause to believe that a felony was being committed therein, such probable cause, coupled with a sufficient exigent circumstance, would have justified and sustained the subsequent warrantless intrusion into Room 120 and a seizure of the evidence therein. *Schmerber* v. *California* (1966), 384 U. S. 757; *Chambers* v. *Maroney, Correctional Superintendent* (1970), 399 U. S. 42. Nevertheless, defendants argue, the matter differs where the officers, although still using only their unassisted auditory sense, in effect point their ears or direct their hearing in unexpected fashion or in unanticipated places. It will be recalled that here the officers were unable to distinguish the words they heard from Room 120 until the Chief placed his ear on the carpeted floor near the interior doors connecting the two rooms; the other officer was unable to understand the conversation until he too moved closer to the same doors, although his posture in doing so was not explored. Defendants ask us to declare that what would not have been an unreasonable search under the Fourth Amendment, had it been performed in a chair or on the couch of Room 118, became so when Chief Sturgill placed his ear near the doors between the rooms. We decline to do so, entertaining no disposition to frame critical constitutional parameters upon such insubstantial and essentially undefinable distinctions. As stated by the United States Court of Appeals for the Ninth Circuit in a case which we find factually indistinguishable from the instant appeal:

"Here the conversations complained of were audible by the naked ear in the next room. True, the listening ear was at the key-hole, so to speak, but another listening ear was also, at one time, on the bed in the middle of the room,

where was heard the pilot's story. Appellants would have us divide the listening room into privileged or burdened areas, and the conversation into degrees of audibility to, we presume, the normal ear, thus a remark heard on the bed arguably admissible, but not those heard at the door, a loud remark admissible, arguably one uttered in normal tones, but definitely not one whispered. We find no precedent for a categorization involving such hair-splitting distinctions and we are not disposed to create one." *United States* v. *Fisch* (C. A. 9, 1973), 474 F. 2d 1071, 1077.

We conclude, therefore, that no constitutionally protected right of privacy was invaded by the officers in Room 118 when they eavesdropped on what was transpiring in Room 120, and no unreasonable search under the Fourth Amendment arose from their activities therein. We believe this conclusion is sound in law and supported by the weight of federal authority. See, in particular, *United States* v. *Fisch, supra; United States* v. *Llanes* (C. A. 2, 1968), 398 F. 2d 880; *Ponce* v. *Craven* (C. A. 9, 1969), 409 F. 2d 621; *United States* v. *Martin* (C. A. 9, 1958), 509 F. 2d 1211; and *United States* v. *Fuller* (C. A. 4, 1971), 441 F. 2d 755. The first three cases involved incriminating conversations in hotel or motel rooms overheard by officers who were deliberately eavesdropping therein with ears as close to the source of sound as physical limitations would permit. The fourth involved a defendant's house, and the fifth a phone booth. As was aptly stated in *United States* v. *Fisch, supra* at 1077:

"Listening at the door to conversations in the next room is not a neighborly or nice thing to do. It is not genteel. But so conceding we do not forget that we are dealing here with the competitive enterprise of ferreting out crime. * * * The officers were in a room open to anyone who might care to rent. They were under no duty to warn the appellants to speak softly, to put them on notice that the officers were both watching and listening. Their means of observation was not improper. In fact, they did not, with their naked ears, intrude upon the appellants at all. If intrusion there was it was, at times, the other way around, as

anyone who has weathered the night in a motel room as the occupants next door partied and argued will bear ready witness."

Indeed, we have been cited to only two cases which may be arguably factually apposite and which reach a contrary result: *State* v. *Person* (1973), 34 Ohio Misc. 97, a case from the Municipal Court of Toledo, Ohio, and *People* v. *Triggs* (1973), 8 Cal. 3d 884, 506 P. 2d 232, a decision of the California Supreme Court. To the extent that these cases reach a result contrary to the foregoing, we decline to follow them. Other authorities relied upon by defendants are, in our judgment and for varying reasons, either inapt or unpersuasive. Thus, two decisions of the United States Supreme Court relied upon by defendants as controlling on the facts of this case, *Johnson* v. *United States* (1948), 333 U. S. 10, and *McDonald* v. *United States* (1948), 335 U. S. 451, both turn on the absence of exigent circumstances to forgive the antecedent necessity of securing a search warrant—an issue which, as we shall next examine, is not present in this case. At this point, the issue is whether the police officers can obtain probable cause for a search (whether with or without an antecedent search warrant to depend on the presence of exigent circumstances) by the kind of non-electronic surveillance undertaken here, or whether the surveillance is itself an unreasonable search prohibited by the Fourth Amendment. We have held the former to be true, and neither *Johnson* nor *McDonald* challenge this conclusion.

Having established that the surveillance by the two officers in Room 118 was not an unreasonable search prohibited by the Fourth Amendment, the next question is whether the product of such surveillance furnished probable cause for them to conclude that a crime was being Committed in Room 120. We think it is perfectly clear that it did. There can be no doubt that if Chief Sturgill and Officer Stevens had taken to a magistrate the information they had secured from the assistant manager together with the references to the purchasing, processing, and sale of marijuana they overheard from Room 120, a search war-

rant would properly and promptly have been issued upon probable cause. *Spinelli* v. *United States* (1969), 393 U. S. 410; *Aguilar* v. *Texas* (1964), 378 U. S. 108. Indeed, except for a plain view of the contraband, it would be difficult to imagine more persuasive cause to believe that a crime was in process of being committed than that in possession of the two officers after they had concluded this eavesdropping.

Yet, the existence of probable cause which we found here, will not alone justify a warrantless search and seizure unless at the same time the presence of exigent circumstances forgives the necessity of taking such probable cause to an independent magistrate for review, pursuant to the issuance of a search warrant. *Vale* v. *Louisiana* (1970), 399 U. S. 30. The final issue is, therefore, whether exigent circumstances were present here. We conclude they were.

When Chief Sturgill overheard one of the occupants of Room 120 say: "Something is wrong. We have to get out of here," he was justified in assuming the likelihood of immediate flight by the occupants of the room with the evidence or after disposing of the evidence. At that point, he reasonably concluded that no time existed to visit a magistrate. Nor are we able to conclude that the officers forfeited their right to claim exigency by sleeping on opportunities to secure a search warrant. The surveillance lasted about one and one-half hours with both officers involved in the effort. The record does not tell us when, during this vigil, the incriminating statements furnishing probable cause were made, but in any event, the interval was not excessive. Additionally, the phone in Room 118 was unavailable to them to request relief (so that, arguably, the officers in question might have gone to a magistrate) because of their apprehension that they would be overheard by those in Room 120. When the two officers finally did divide forces, it was to send Stevens for reinforcements. It was shortly thereafter and before the reinforcements arrived that the occupants of Room 120 became alerted to the existence of trouble and apparently determined to depart, giving rise to the necessity for immediate police

action in order to preserve both persons and evidence.

It follows from what we have determined that the trial court erred in granting the motions to suppress and that the appellant's assignment of error must be sustained. Accordingly, the orders of the trial court are reversed, and these causes are remanded to the Court of Common Pleas for further proceedings consistent with this decision and with law.

*Judgments reversed.*

SHANNON, P. J., and KEEFE, J., concur.