**UNITED STATES of America**

**v.**

**Joseph P. BRANCH, Appellant.**

**UNITED STATES of America**

**v.**

**Eric B. GARRISON, Appellant.**

**Nos. 75–1728, 75–1729.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1976.

Decided Oct. 27, 1976.

---

David B. Allen, Baltimore, Md., for appellants.

Karen I. Ward, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D.C., were on the brief for appellee.

Before BAZELON, Chief Judge, TAMM, Circuit Judge and JUSTICE,* United States District Judge for the Eastern District of Texas.

Opinion for the Court filed by District Judge JUSTICE.

JUSTICE, District Judge:

On July 19, 1974, at approximately 7:00 p. m., officers of the Metropolitan Police Department executed a warrant authorizing search "in the daytime" of the apartment of appellant Joseph P. Branch. Branch was in the apartment at the time of the search. When the search revealed quantities of narcotic substances, he was arrested and subsequently convicted of the offenses of possession of cocaine and possession with intent to distribute of marijuana and hashish. Appellant Eric B. Garrison arrived at Branch's apartment later the same evening and was found to have in his possession various controlled substances. He was afterwards indicted for, and convicted of possession of cocaine, marijuana, hashish, and L.S.D. with intent to distribute. Both appellants complain of the trial court's denial of their respective motions to suppress.

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

## I. APPELLANT BRANCH

It is Branch's sole contention in this appeal that Police Officer William Clark's affidavit, made in support of the application for the search warrant for appellant's apartment, contained material misrepresentations of fact, thereby rendering the warrant deficient as to probable cause. In the affidavit, Clark averred: (1) within the preceding seventy-two hours, he had been told by a reliable informant that the informant could purchase narcotics in the apartment; (2) the informant had previously proven to be reliable on two occasions, when he had purchased narcotics under controlled conditions; and (3) the informant and the officer had gone to Branch's apartment, at which time the informant had purchased narcotics.

In *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the affidavit forming the basis for the issuance of a search warrant stated, in conclusory terms, that the informant's tip upon which it was grounded was "reliable" and had been obtained from a "credible" person. The Court held the affidavit insufficient to establish probable cause, stating:

> Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant . . . the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the

underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, . . . was "credible" or his information "reliable."

378 U.S. at 114, 84 S.Ct. at 1514.

Another controlling decision, *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), involved an affidavit characterized by the Court as "more ample" than the one involved in *Aguilar.* Again, however, the Court found the affidavit constitutionally infirm, for failure to disclose a basis for the affiant's determination that the informant was reliable.

■ Examination of the affidavit before the court in light of the *Aguilar-Spinelli* line of authority supports the trial court's determination. *See also United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). The basis for the officer's conclusion as to the informant's reliability is set out on the face of the affidavit, *i. e.,* that he had "provided reliable information in controlled circumstances on two previous occasions." Moreover, the officer had personally observed a "controlled buy", and this fact clearly provided a reasonable basis for the officer's belief that the informant was possessed of accurate information on this occasion. Further, the personal observation of the officer provided an independent ground for the magistrate's conclusion that the apartment was a place where narcotic substances were being sold.[1] *See*

---

[1] The "controlled buy" to which Officer Clark refers is set out in the affidavit as follows:

Within the past seventy-two (72) hours the affiant met with a reliable source who stated that it could purchase narcotics from the above described premises. This source has proven itself reliable on two occasions in the past when it purchased narcotics under controlled conditions.

At the time of the above mentioned meeting the source was thoroughly searched to insure that it did not have any money or narcotics on its person. This source had neither money or narcotics on its person. The affiant then took the source to the above mentioned location and gave it a quantity of Metropolitan Police Department Funds and instructed it to enter the above described apartment and buy whatever narcotics it could. The affiant

observed the source go directly into the apartment without stopping to talk to anyone.

A short time later the source left the apartment and returned directly to the affiant. Again the source was in clear sight of the affiant the entire time after leaving the apartment and did not stop to talk to anyone. The source handed the affiant a quantity of narcotics and again was searched to insure that it did not have any money or narcotics on its person. This search proved negative. The source told the affiant that he had purchased the narcotics from a light skinned Negro male six foot tall thin build with a slight beard and mustache.

A preliminary field test was performed by the affiant on the suspected narcotics and a positive reaction was received from THC, which is the active ingredient in Marijuana.

United States v. Thornton, 147 U.S.App. D.C. 114, 454 F.2d 957 (1971); United States v. McKethan, 247 F.Supp. 324, 326 (D.D.C. 1965); Irby v. United States, 114 U.S.App. D.C. 246, 251, 314 F.2d 251, 256 (1963) (Wright, J., dissenting). Considering these circumstances, no reason appears to question the magistrate's finding of probable cause.

Rather than attacking the facial validity of the affidavit, appellant Branch focuses his argument upon certain material representations in the affidavit, which he alleges to be false. In opposition, the government argues that introduction of evidence to contest the allegations in an affidavit for a search warrant is impermissible. The extent to which the factual accuracy of a facially sufficient affidavit may be controverted by evidence outside its four corners has not yet been settled by the Supreme Court.[2] Obviating any possibility of error in this respect, the district court afforded appellant Branch a full hearing, over the prosecutor's objection to the propriety of the procedure.

■ At the hearing, appellant Branch sought to prove that the controlled buy had not, in fact, taken place. Taking the witness stand, appellant testified that he was not at home on the night of the alleged transaction, and also presented other evidence, from which he argued that Clark could not possibly have witnessed the sale in the manner he described. The trial court permitted comprehensive testimony from both sides, and accepted into evidence photographs relevant to appellant's second contention. At the conclusion of the hearing, the trial court specially found the testimony of Clark to be more credible than that of the appellant's witnesses. We thus find it unnecessary to rehash the evidentiary issues involved in the hearing, for there is no indication, viewing the evidence in the light most favorable to the government, that the trial court's findings were clearly erroneous.[3] Accordingly, appellant Branch's conviction must be affirmed.

## II.  APPELLANT GARRISON

### A.  Factual Background

Officer Clark testified that he and several other officers arrived at Branch's apartment at approximately 7:00 p. m. on July 19, 1974, to execute the search warrant.[4] Upon being admitted into the apartment, they found therein appellant Branch and Carolyn Kelly, who described herself as his "play sister". Leroy Forney, a defense witness, was later found by the officers in a bedroom.[5] Almost immediately, the police

---

2.  Rugendorf v. United States, 376 U.S. 528, 531–32, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). Both federal and state courts are divided on the issue, and at least two Justices of the United States Supreme Court have indicated that the time is ripe for decision by the Court. North Carolina v. Wrenn, 417 U.S. 973, 94 S.Ct. 3180, 41 L.Ed.2d 1144 (1974) (White, J., and Burger, C. J., dissenting from denial of certiorari). See generally United States v. Belculfine, 508 F.2d 58 (1st Cir. 1974); United States v. Dunnings, 425 F.2d 836 (2d Cir. 1969), cert. denied, 397 U.S. 1002, 90 S.Ct. 1149, 25 L.Ed.2d 412 (1970); United States v. Thomas, 489 F.2d 664 (5th Cir. 1973); United States v. Upshaw, 448 F.2d 1218, 1220–22 (5th Cir. 1971), cert. denied, 405 U.S. 934, 92 S.Ct. 970, 30 L.Ed.2d 810 (1972); United States v. One 1965 Buick, 392 F.2d 672, 678 (6th Cir. 1968); United States v. Carmichael, 489 F.2d 983 (7th Cir. 1973); United States v. Bolton, 458 F.2d 377 (9th Cir. 1972); United States v. Halsey, 257 F.Supp. 1002 (S.D.N.Y. 1966); Kipperman, Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence, 84 Harv.L.Rev. 825 (1971); Note, Test-

ing the Factual Bases of a Search Warrant, 67 Colum.L.Rev. 1529 (1967).

In this circuit, the latest ruling on the question appears to be United States v. Thornton, supra, which held that there is no automatic right to such a hearing, but, citing United States v. Dunnings, supra, intimates that a hearing is proper in certain circumstances, e. g., where there is an initial showing of falsehood to the magistrate. See also Walker v. United States, 117 U.S.App.D.C. 151, 327 F.2d 597, 600–01 (1963) (Wright, J., joined by Bazelon, C. J., dissenting from denial of rehearing en banc).

3.  Cf. Jackson v. United States, 122 U.S.App. D.C. 324, 353 F.2d 862 (1965).

4.  A defense witness, Frederick Edward Dixon, testified that when he arrived at the apartment that evening, at about 5:30 to 6:00 p. m., the search was already in progress.

5.  Mr. Forney's version of the night's occurrences was quite different. He testified that he arrived around 8:00 to 8:30 p. m.; that when he

officers discovered a quantity of marijuana on a table in the apartment. Branch was then arrested, advised of his *Miranda*[6] rights, and the officers continued their search.

At about 8:15 p. m., the telephone in the apartment rang, and Clark answered. He related this incident, as follows:

> I just said "Hello", you know, not very loud, and the voice on the other end said, "J.B.?" and I acknowledged. He then said he's going to come over or he was ready to come over and would nine o'clock be all right. I told him to come earlier, that there was trouble in the building. And he said all right. And that was it. Tr. 55.

The relevancy of the above conversation stems from a tip given by Clark's informant that a shipment of narcotics was expected at the apartment that night. Appellant Garrison subsequently arrived at the apartment between 8:40 and 8:50 p. m. Thus, the government contends it was reasonable to assume (1) that Garrison was the other party to the telephone conversation, and (2) that he was the person with the expected shipment of narcotics. Further buttressing this conclusion, in the government's view, is the fact that, at the time he appeared on the scene, Garrison was carrying a large canvas shoulder bag suitable for transporting narcotics.

Officer Clark's testimony concerning the seizure and search of appellant Garrison, which was obviously credited by the trial court, was to the following effect: When Garrison knocked, Clark opened the door for the appellant. Garrison entered while

looking over his shoulder toward the hallway behind him, and he apparently did not realize that a police officer was admitting him into the apartment.[7] Clark immediately identified himself, informed the appellant that a search warrant was being executed, and gave Garrison the *Miranda* warnings. Garrison was then told by Clark that he would be searched and, if narcotics were found, would be arrested. Garrison's reaction was to drop his head, exclaim "I'm busted!", and let his canvas bag drop to the floor.[8] When Clark questioned appellant about the contents of the bag, Garrison told the officer, "That's it." The bag was immediately searched by the officers and found to contain a quantity of cocaine and marijuana.

### B. *Scope of the Warrant*

The government has not sought at any time to justify the seizure of narcotics from appellant's shoulder bag as a valid exercise of the authority granted by the warrant to search the apartment, *cf.* Appellee's Brief, at 46, recognizing that such a warrant did not authorize the search of all persons who may have been present. *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). *See also United States v. Haywood,* 284 F.Supp. 245 (E.D.La.1968).

The concept that a premises search warrant does not embrace personal searches has presented some difficulty in application. In *Walker v. United States,* 117 U.S.App.D.C. 151, 327 F.2d 597 (1963), this court held that a wallet and paper bag, passed by one occupant of the residence to the other, were both within the scope of the warrant. The court concluded that the fact that the items

---

knocked on the door, an officer opened it and grabbed him; that although he tried to escape, the officer was able to force him, Forney, into the apartment.

6. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

7. The appellant's recollection of the incident is diametrically opposed. He testified that, as he was in the process of knocking on the door, it swung open; that Officer Clark then displayed his identification, grabbed appellant and pulled him (appellant) into the apartment.

8. In contrast to his testimony at the suppression hearing, this officer testified at a preliminary hearing, on August 8, 1974, as follows:

> Mr. Garrison knocked and entered the apartment, *at which time we took from him a shoulder bag,* a large canvas shoulder bag, advised him we were executing a search warrant on the premises, and that he was given his rights. (Emphasis added.)

Garrison testified that the officer took the bag off his, Garrison's, shoulder.

were held in one of the occupant's hands did not make the search a personal one. In *United States v. Teller,* 397 F.2d 494 (7th Cir. 1968), *cert. denied,* 393 U.S. 937, 89 S.Ct. 299, 21 L.Ed.2d 273 (1968), the search of a woman's purse was upheld on the basis of a premises search warrant. Resolution of the issue of the legality of the search apparently rested upon whether the seized item had been within the physical possession of the woman at the time of the search. The *Teller* and *Walker* holdings were criticized by the First Circuit in *United States v. Micheli,* 487 F.2d 429 (1st Cir. 1973) [9] In *Micheli,* the extent to which personal effects lie outside the scope of a premises search warrant was said to turn upon the "relationship between the person and the place." *Id.,* at 431. The *Micheli* court reasoned that an occupant of a residence which is being searched loses the privacy interest in his belongings situated there; however, a transient visitor retains his expectancy of privacy, and it makes little difference whether his belonging is being personally held by him or has been set down temporarily. *Id.,* at 432.

The holdings made in *Teller* and *Walker* have retained their vitality in this circuit. In *United States v. Johnson,* 154 U.S.App. D.C. 393, 475 F.2d 977 (1973) (Bazelon, C. J., dissenting), this court held a purse in the apparent possession of the non-occupant appellant was within the scope of the questioned premises search warrant. Noting that the purse searched by the officers was situated apart from the person of its owner, the court, citing *Teller,* concluded that the search "did not constitute an extension of her person so as to make the search one of her *person.* * * * The invasion of appellee's privacy was therefore of a lesser degree than if she had been subjected to a search of her clothing or of objects being held by her." *Id.,* at 979.

■ Thus, while such personal items as the shoulder bag under consideration may, in some circumstances, be found to be within the ambit of a premises search warrant, we are here persuaded otherwise. Appellant was not in the apartment when the search began, nor was he offered the opportunity to leave immediately upon discovery of the search in progress. He was apparently a mere visitor; his relationship to the premises was not known, but was at best the subject of speculation. At the time of his entry into the apartment, the bag in dispute was suspended from his shoulder. Under these circumstances, we conclude that none of the cited authorities would support a finding that the search of appellant's shoulder bag was authorized by the search warrant for the apartment.

### C. *Probable Cause*

The government relies most heavily upon its contention that the search was incident to a valid arrest. Our analysis of the facts presented in this connection is similar to that of the Court in *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964):

> The constitutional validity of the search in this case . . . must depend upon the constitutional validity of the petitioner's arrest. Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or

9. The court wrote:

Some courts approach the quest for principle by immunizing from a search under sanction of a premises warrant any item within the physical possession of an individual on the premises [citing *Teller*]. This has the virtue of precision but suffers from being at once too broad and too narrow. It is too broad in that a search warrant could be frustrated to the extent that there are hands inside the premises to pick up objects before the door is opened by the police. This obvious loophole has led at least one court to bar such frustration by extending permissible search to objects held in hand [citing *Walker*]—a rule which preserves the efficacy of a warrant by obliterating the distinction between a search of premises and a search of the person. 487 F.2d at 431.

was committing an offense. *Brinegar v. United States,* 338 U.S. 160, 175–76 [69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879] (1949).

■ Despite Clark's protests to the contrary, the prosecutor at trial conceded, and the trial court found, that Garrison was arrested when he entered the apartment. This finding is fully justified by the record. However, even if this were not the case, it is abundantly clear that Clark announced his intention to search appellant Garrison immediately upon the latter's entry.[10] If a full search was undertaken, probable cause to arrest was required, despite the fact that the "formal" arrest was not accomplished until after the search.[11] *United States v. Brown,* 150 U.S.App.D.C. 113, 463 F.2d 949 (1972); *Bailey v. United States,* 128 U.S. App.D.C. 354, 389 F.2d 305, 308 (1967).

■ It is the contention of the government, and the ruling of the court below,

that probable cause existed to arrest the appellant upon his arrival at the apartment.[12] In support of this conclusion the following factors have been cited: (1) the informant's tip that controlled substances would be found in the apartment had been verified; (2) the informant had also indicated that a shipment of narcotics was expected at the apartment that night; (3) Clark had intercepted a telephone call and engaged in the conversation earlier set forth; (4) appellant Garrison arrived within the time frame mentioned in the telephone call; (5) he was an adult male, as was the telephone caller; and (6) he was wearing a large shoulder bag, which was suitable for concealing narcotics. Relying on the above factors, Officer Clark concluded that he was warranted in searching the appellant. Appellant Garrison maintains that the police did not have probable cause to arrest and search him, contending that he was a victim of a "general sweep" that included every-

---

**10.** On direct examination, Clark testified as follows:

> Q. And then what happened [after the knocks at the door]?
> A. Well, he wasn't looking into the apartment. He was more or less looking over his shoulder down the hall, and he just stepped in, and I closed the door, and he looked rather surprised to see me standing there.
> I advised him that we were police officers. I advised him that we had a search warrant for the premises; we were searching for narcotics. I advised him of his rights and told him that he could be searched and if narcotics was [*sic*] found, he'd be arrested.
> THE COURT: How could you search him?
> THE WITNESS: Your Honor, a general search of anyone coming in an apartment like that for our own safety and well-being.
> THE COURT: A search?
> THE WITNESS: We, pat down, your Honor, I guess.
> THE COURT: Well, you said search.
> THE WITNESS: Yes, sir, I did.
> THE COURT: And then you qualified it for your own protection and well being.

**11.** A frisk intended for protective purposes, *cf. Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), may lead to information sufficient to establish probable cause for a full search. *See, e. g., Guzman v. Estelle,* 493 F.2d 532 (5th Cir. 1974).

**12.** The district court found that probable cause existed, regardless of whether Garrison's action in throwing down his shoulder bag and ex-

claiming "I'm busted!" are considered. We believe such action and words may not be considered, for they occurred subsequent to the arrest. Garrison threw down his bag after Officer Clark made it plain that the appellant would be searched. Such admission as may be inferred from Garrison's actions and words were obviously produced by the officer's claim of authority and intent to search.

The Supreme Court has held that consent to search may not be found in analogous situations:

> Conversely, if under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, *or granted only in submission to a claim of lawful authority*—then we have found the consent invalid and the search unreasonable. (Italics added.)

*Schneckloth v. Bustamonte,* 412 U.S. 218, 233, 93 S.Ct. 2041, 2051, 36 L.Ed.2d 854 (1973). In *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), law enforcement officials gained entrance to a residence by falsely asserting they had a warrant to search, and the court found no consent. Here, we find a decision to search to have been made prior to appellant's excited conduct. His actions and words, like the consent in *Bumper,* were in submission to the claim of lawful authority and may not be considered in evaluating probable cause. *See also Judd v. U. S.,* 89 U.S.App.D.C. 64, 190 F.2d 649 (1951).

one arriving at the apartment on that night, all of whom were illegally searched.

Although there was diametrically conflicting testimony concerning the extent of other searches in the appellant's apartment on the evening in question, we perceive no infirmities in the trial court's findings under the "clearly erroneous" standard of *Jackson v. United States,* 122 U.S.App.D.C. 324, 353 F.2d 862 (1965). Ms. Kelly, who was at the apartment when the police arrived, stated that the officers searched her purse. Another witness, Dixon, testified that his person was searched—but he also gave evidence that the search occurred between 5:30 p. m. and 6:00 p. m., well before the time appellant Branch testified that he arrived at home, and also long prior to the time the officers testified that they came upon the scene. The witness Jeri, appellant's "girl friend", related that she arrived at the apartment between 8:30 p. m. and 9:00 p. m., and that her bag was searched. Finally, the testimony of a Mr. Forney [13] was to the effect that his pockets were searched by the officers, when he came to the apartment.

In corroboration of his witnesses, Garrison testified that two women had come to the apartment during the search, and that their hand bags were searched. On the other hand, Clark asserted: "Well, we didn't have any female with us, so none of the girls were searched." [14] Nevertheless, in closing argument the prosecutor conceded, ". . . as to the arrival of the other people at the front door, they all came to the door voluntarily . . . They were all searched one degree or another by the police at least for security precautions, and with the exception of Mr. Forney all were permitted to go." [15]

The government urges that searches of other individuals during the execution of the search warrant do not bear on an evaluation of probable cause to arrest the appellant, since Garrison was the only one searched who could be tied to the allegedly incriminating telephone call.[16] Likening the instant factual setting to a *"Draper* situation",[17] the government maintains that the circumstances of other searches or "pat downs" at the time in issue are not relevant. In *Draper,* a federal narcotics agent, acting upon a tip from a paid informant, made a warrantless arrest and search of the petitioner. The Court found that probable cause to arrest existed, because the information from the informant was explicitly detailed and corroborated by events as they transpired.[18] It is our view that the present situation is a far cry from that described by the court in *Draper.* Officer Clark's informant told him that there was a shipment of

---

**13.** His testimony, in contradiction to the government's witnesses, is related in n.5, *supra.*

**14.** Tr. at 63.

**15.** Tr. at 144.

**16.** Since the telephone caller was an adult male, the government contends that the women who claimed that their purses were searched would be eliminated from suspicion. Dixon and Forney, under any version of the sequence of events, both arrived prior to the telephone call. Hence, the appellant was the only person searched subsequent to the telephone conversation, and he arrived within the time frame contemplated by the conversation.

**17.** *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

**18.** The informant had described Draper to the agent as a black man, of light brown complex-

ion, twenty-seven years of age, five feet eight inches tall, weighing about 160 pounds, and wearing a light-colored raincoat, brown slacks and black shoes. The informant stated that Draper was peddling narcotics, had gone to Chicago to obtain a supply, and would return on the morning of September 8 or the morning of September 9. He further stated that Draper would be carrying a tan zipper bag and that he habitually "walked real fast". The agents observed a man fitting the precise physical description and wearing the exact clothing that the informant had described alight from a train arriving from Chicago on the morning of September 9, carrying a tan zipper bag and walking fast. Having thus verified every other bit of the informant's tip, the Court found it reasonable that the agent should believe the remaining unverified bit of information—that Draper would have the narcotics with him—was likewise true. *Id.* at 313, 79 S.Ct. 329.

narcotics expected at the appellant's apartment on the night of the search. Nothing further was revealed which necessarily implicated Garrison or anyone else carrying a canvas shoulder bag. The informant did not indicate the time, means, or mode of the delivery, nor the number of persons who would participate in it, whether one or more. Neither did he furnish any further details concerning any individual who might be involved in the consignment, such as, *e. g.*, name, sex, race, age, complexion, height, weight, habits, voice, accent, clothing or accoutrement. In *Draper*, all of these descriptive items were given to the arresting officers, except for voice and accent.

The government puts great weight upon the intercepted telephone call, contending that Clark reasonably concluded that the caller was likely the narcotics contact. This argument must be examined in the light of the circumstances here shown.[19] While it is true that a quantity of marijuana, hashish, and cocaine was found in Branch's apartment, there was no evidence that the residence was a "shooting gallery", *see United States v. Johnson, supra*, 154 U.S.App.D.C. at 397, 475 F.2d at 981, or was a place wherein "[u]nder the circumstances . . 'it [was] plainly unreasonable to infer that anyone else other than a participant [in narcotics use] would be allowed on the premises.'" *United States v. Peep*, 490 F.2d 903, 906 (8th Cir. 1974). *See also United States v. Pentado*, 463 F.2d 355, 363 (5th Cir. 1972), *cert. denied*, 409 U.S. 1079, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972), 410 U.S. 909 (1973). Nothing in the record indicates that an individual coming to appellant Branch's door would perforce have been presumed to be carrying narcotics, for several people came to his apartment on the evening in question. Nor can it be said in this day and age that a male wearing a shoulder bag is unduly suspect.

■ While we are somewhat uncomfortable with the proposition, we think it not completely unreasonable for Clark to have surmised that Garrison was the telephone caller.[20] But even assuming that Garrison, in fact, made the telephone call, no articulable justification, based on either substance or tone of the conversation, is set out in the record to support the officer's conclusion that Garrison was arranging for the delivery of narcotics. It chanced that the officers were right in suspecting Garrison; however, this same global, undifferentiated suspicion had led to their searching every person who came to the apartment on the particular evening. And it is abundantly clear that a mere suspicion is not enough to justify an arrest;[21] only probable cause suffices.

**19.** While the appellant .attempted to demonstrate that the only telephone calls received at the apartment on the occasion under consideration were from females, the trial court was not persuaded, nor does the record compel such a finding on appeal.

**20.** We note that appellant Garrison has not raised a challenge, either under the fourth amendment or Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq.*, to the propriety of Clark's interception of the telephone conversation. *See, e. g., United States v. Jones*, 140 U.S.App. D.C. 70, 433 F.2d 1176 (1970); *Billeci v. United States*, 87 U.S.App.D.C. 274, 184 F.2d 394 (1950) and cases collected in the annotation "Telephone Communication—Interception," 9 A.L.R.3d § 4 at 423, 431. *See also Flaherty v. Arkansas*, 415 U.S. 995, 94 S.Ct. 1599, 39 L.Ed.2d 893 (1974) (Douglas, J., dissenting from denial of certiorari). However, "[i]t has always been the custom of this court 'in cases of serious criminal offenses, to check carefully the record for error prejudicial to defendant which he did not urge,' either at the trial or in this court." *Gregory v. United States*, 125 U.S. App.D.C. 140, 142, 369 F.2d 185, 187 n. 5 (1966), citing *Williams v. United States*, 76 U.S. App.D.C. 299, 300, 131 F.2d 21, 22 (1942). Since appellant denies that he placed the telephone call, his standing to raise the issue may well be doubted. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *cf. United States v. Turk*, 526 F.2d 654 (5th Cir. 1976). In any event, since we find the product of the interception to be of minimal or no benefit in evaluating probable cause, the question is not worthy of further consideration.

**21.** *U. S. v. Carter*, 173 U.S.App.D.C. 54, 69, 522 F.2d 666, 681 (1975); *Bailey v. United States*, 135 U.S.App.D.C. 95, 101, 416 F.2d 1110, 1116 (1969).

"In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States, supra,* 338 U.S. at 175, 69 S.Ct. at 1310. In this instance, it does not appear that there was reasonable cause for a prudent man to conclude that Garrison was probably the narcotics carrier, simply because he—as did several others—arrived at the apartment on an evening when a shipment was expected. Even giving incremental effect to the telephone conversation, it seems innocuous and undesigning; the unidentified participant in the conversation was, at most, uncommunicative and non-committal. While this court has repeatedly announced its deference to the informed opinions and conclusions of trained and experienced law enforcement officials,[22] unarticulated hunches have not been found sufficient to support a finding of probable cause.[23] The tenor and tone of the telephone conversation could not reasonably have provided a basis for escalating a prudent man's suspicions to probable cause. It follows that the search incident to the arrest was improper, and the evidence introduced at trial against appellant Garrison should have been excluded. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).[24] Without this evidence, the government will be unable to prove its case against Garrison. His conviction is, therefore, REVERSED, and it is ORDERED that the prosecution be dismissed.

**22.** *See, e. g., U. S. v. Davis,* 147 U.S.App.D.C. 400, 458 F.2d 819 (1972); *Davis v. U. S.,* 133 U.S.App.D.C. 172, 409 F.2d 458 (1969), *cert. denied,* 395 U.S. 949, 89 S.Ct. 2031, 23 L.Ed.2d 469 (1969); *Coleman v. United States,* 137 U.S. App.D.C. 48, 53, 420 F.2d 616, 621 (1969).

**23.** *Terry v. Ohio, supra,* 392 U.S. at 22, 88 S.Ct. 1868.

**24.** Even though the police lacked probable cause to *arrest* Garrison at the time he entered the apartment, reasonable suspicion would have been sufficient to justify an "investigatory stop." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1971); *Terry v. Ohio, supra,* 392 U.S. at 22, 88 S.Ct. at 1880. And once Garrison had been stopped, the police might well have been justified in conducting a limited protective search for weapons. Such a search requires only that the police have "reason to believe" that the individual with whom they are dealing may be armed and dangerous, either to himself, to them, or to others. *Terry v. Ohio,* 392 U.S. at 27, 88 S.Ct. 1868; *Adams v. Williams,* 407 U.S. at 146, 92 S.Ct. 1921; *United States v. Robinson,* 153 U.S. App.D.C. 114, 141, 471 F.2d 1082, 1109 (1972) (Bazelon, C. J., concurring), *rev'd on other grounds,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

It is, of course, possible that such a limited protective search, pursuant to a "reasonable investigatory stop," would have uncovered the contraband at issue here. We are, however, disinclined to engage in this sort of speculation. "A lack of probable cause cannot be made up in hindsight by a hypothetical variation in the basis on which a search was conducted." *United States v. Cunningham,* 138 U.S.App. D.C. 29, 30, 424 F.2d 942, 943, *cert. denied,* 399 U.S. 914, 90 S.Ct. 2218, 26 L.Ed.2d 572 (1970).

Such speculation seems especially inappropriate here, where there is no evidence in the record which could support the conclusion that the search at issue was a protective one. Neither the government nor the trial court advanced this theory to support the search. Moreover, there is uncontroverted testimony by Garrison that he was never frisked by the police while he was in Branch's apartment. Tr. at 124. Since the police apparently did not consider it necessary to frisk Garrison for weapons, we can hardly conclude that their search of his bag was motivated by their "reasonable belief" that he was armed and dangerous. *See United States v. Collins,* 142 U.S.App. D.C. 100, 107, 439 F.2d 610, 617 (1971).