**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 2 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

ROCKY VOGL; KAREN VOGL,

    Defendants-Appellees.

No. 99-1583
(D. Colo.)
(D.Ct. No. 98-CR-257)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRORBY**, **PORFILIO**, and **BALDOCK**, Circuit Judges.
_____

The government appeals the district court's grant of Karen Vogl's motion to suppress the padlock key removed from inside her purse. We have jurisdiction pursuant to 18 U.S.C. § 3731. We affirm the district court's decision, but for reasons slightly different than those relied upon by the district court. *See United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994).

_____

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

BACKGROUND

On June 2, 1998, federal Drug Enforcement Agency agents and task force officers (collectively "officers") observed a man, later identified as Rocky Vogl, carrying several unmarked boxes out of a hydroponics store in Boulder, Colorado. [1] The officers ran Mr. Vogl's license plate number through the Department of Motor Vehicles records and followed him to his residence at 17945 Steeplechase Drive in Peyton, Colorado. At this time, the officers did not know Karen Vogl existed, was married to Mr. Vogl, or lived at that residence.

Approximately one week later, the officers returned to the residence to conduct visual surveillance and determine whether they could smell growing marijuana plants. The officers smelled growing marijuana as they walked toward the house. The agents did not observe Karen Vogl during their surveillance.

After the surveillance, the agents administratively subpoenaed the electrical bills for the Steeplechase Drive residence in order to determine whether the wattage levels for the house were unusually high, which is a fact consistent with the indoor growth of marijuana plants. The electrical bills were in Mr. Vogl's

---

[1] Hydroponic equipment is used to grow plants, including marijuana plants, indoors.

name exclusively.

On June 12, 1998, Officer Scott Schacht obtained a federal search warrant for the residence described as 17945 Steeplechase Drive, Peyton, Colorado. The search warrant authorized the officers to search for, among other things, "[a]rtifacts of personal property tending to establish the identify [sic] of the person or persons in control of premises where marijuana is under cultivation, ... which include but not limited to: ...keys." However, the warrant did not authorize the officers to search persons found at the premises. The search warrant and Officer Schacht's seven-page affidavit supporting it do not mention Karen Vogl.

On June 15, 1998, the officers executed the search warrant. When the officers arrived at the residence, Karen Vogl and her children were standing in the driveway near her car. She wore her purse and held bags of groceries in her hands. An officer approached Karen Vogl, identified himself as an officer, and informed her the officers intended to execute the search warrant at the residence. There is no evidence suggesting the officers ascertained Karen Vogl's identity or relationship to the premises when they encountered her in the driveway.

Karen Vogl initially agreed to open the door of the residence for the officers, but she requested time to read the search warrant before doing so. Because the officers were concerned about securing the premises, an officer forcibly moved her from the entrance in order to gain access to the residence. Another officer grabbed her keys from her hand and unsuccessfully attempted to find a key that would open the door. The officer returned the keys to Karen Vogl once she indicated she would open the door for the officers. With the search warrant and keys in her hand, she approached the door but did not open it. Instead, she held the keys to her chest and stated she wanted to read the search warrant first.

An officer moved Karen Vogl away from the door and placed her under arrest for "obstructing, not letting [the officers] into the doorway, standing in the doorway and clutching the keys and obstructing the agent." During the arrest, the officer handcuffed her, removed her purse from her person, and placed the purse on the porch. She remained handcuffed for over an hour while the officers searched the residence. There is no evidence in the record suggesting that during her arrest or the subsequent search of the residence the officers determined her relationship to the premises.

In order to effect entry into the home officers broke the back door lock. Once inside the residence, an officer found a hidden trapdoor secured by a locked padlock. He cut the lock and discovered over 350 growing marijuana plants in an underground room. After this discovery, an officer decided to search Karen Vogl's purse, which was still located on the porch where the arresting officer had placed it. The officer removed a keychain with keys from her purse, and matched a key from the keychain to the padlock that secured the underground marijuana growing room. [2] The padlock key is at issue in this case. After the officers conducted their search of the residence and Karen Vogl's purse, they removed her handcuffs and left her at the premises with the children, the groceries, and her purse.

Karen Vogl filed a motion to suppress the padlock key found in her purse. In response, the government advanced alternative theories why the key should not be suppressed: (1) the officers legally detained Karen Vogl pursuant to *Michigan v. Summers*, 452 U.S. 692 (1981), they arrested her after the search of the home provided them probable cause, and they searched her purse pursuant to the search

---

[2] We do not know whether the keys removed from her purse are the same keys Karen Vogl clutched to her chest before the officers arrested her. However, it is clear the keys were in her purse after she was arrested and prior to the officer's search of the purse.

incident to arrest exception to the warrant requirement; and (2) the purse rested within the curtilage of the house and fell within the scope of the premises search warrant. After an evidentiary hearing, the district court granted Karen Vogl's motion to suppress the padlock key. The district court held: (1) Karen Vogl was not permissibly detained, her arrest was illegal and not supported by probable cause, and the officer's search of her purse was not a valid search incident to lawful arrest; and (2) the seizure and search of her purse was not authorized by the premises search warrant. The court denied the government's motion to reconsider and affirmed its suppression order.

"In reviewing the district court's grant of a suppression motion, we accept the district court's factual findings absent clear error and review de novo the district court's determination of reasonableness under the Fourth Amendment to suppress the ... evidence." *United States v. Olguin-Rivera*, 168 F.3d 1203, 1204 (10th Cir. 1999). Because the government appeals an adverse ruling on a motion to suppress, we construe the facts in the light most favorable to Karen Vogl. *United States v. Lin Lyn Trading, Ltd.*, 149 F.3d 1112, 1113 n.1 (10th Cir. 1998).

## DISCUSSION

The Fourth Amendment protects people from unreasonable searches and

seizures.[3]  U.S. Const. amend. IV.  Absent certain exceptions, "[t]he Fourth

Amendment normally requires that law enforcement officers obtain a warrant,

based on probable cause, before conducting a search."  *United States v.*

*Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998).  "This means that before an

officer may search one's premises or seize one's property he must have a search

and seizure warrant."  *Pearson v. United States*, 150 F.2d 219, 220 (10th Cir.

1945).  However, the probable cause that supported the issuance of a premises

search warrant "does not, without more, support the search of [defendant's

person]."  *United States v. Sporleder*, 635 F.2d 809, 813 (10th Cir. 1980).


The government raises one issue in this appeal.[4]  The government asserts

the officers legally searched Karen Vogl's purse, pursuant to the premises search

warrant, because the purse was on the premises and could contain items listed in

---

[3] Neither Karen Vogl nor the government raises the issue, but we will assume
without deciding Karen Vogl possesses a reasonable subjective and objective expectation
of privacy in the contents of her purse.  *United States v. Anderson*, 154 F.3d 1225, 1229
(10th Cir. 1998), *cert. denied*, 526 U.S. 1159 (1999).

[4] Karen Vogl focuses her response to the government's appeal argument on the
fact the evidence seized from her purse "was the result of an illegal arrest not supported
by probable cause."  We note the district court held the officers improperly arrested Karen
Vogl, and the government does not appeal the issue, but we find it unnecessary to further
discuss appellee Vogl's contentions because we affirm the district court's decision on
other grounds.  *See Sandoval*, 29 F.3d at 542 n.6.

the warrant. In other words, the government suggests the purse fell within the scope of the premises search warrant. [5]

1. *Wyoming v. Houghton*

The government claims *Wyoming v. Houghton*, a Supreme Court case addressing a container search pursuant to the automobile exception to the warrant requirement, controls the scope of a container search pursuant to a premises search warrant. 526 U.S. 295 (1999). Specifically, the government cites footnote one of the majority opinion for its proposition the scope of a warrantless automobile search supported by probable cause is no broader or narrower than the scope of a premises search supported by a search warrant. *See id.* at 303 n.1. Thus, the government suggests the fact that *Houghton* involved a search of a purse pursuant to the automobile exception is immaterial – so long as the officers do not conduct a search of property contained in clothing worn by that person, the context, or place, where the property is found no longer matters. In other words, the government attempts to diminish the significance of context by arguing *Houghton* controls our analysis.

---

[5] For purposes of this appeal, we will assume without deciding the porch is within the home's curtilage, and is covered by the premises search warrant.

In *Houghton*, an officer conducted a routine traffic stop of an automobile, and searched a passenger's purse found, detached from her person, on the back seat of the car. *Id.* at 298. The Supreme Court adopted a bright-line rule specific to vehicle searches pursuant to the automobile exception to the warrant requirement. 3 Wayne R. LaFave, Search and Seizure, § 7.2, at 67, 75 (3d ed. Supp. 2001). The Court held that "police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search" without a warrant. *Id.* at 307.

In footnote one, the *Houghton* majority defends its distinction between the search of a person and search of property, and asserts the distinction is rooted in the Court's precedent. *Id.* at 303 n.1. The majority inquires,

> Does the dissent really believe that Justice Jackson [in *United States v. Di Re*, 332 U.S. 581, 587 (1948)] was saying that a house-search could not inspect property belonging to persons found in the house – say a large standing safe or violin case belonging to the owner's visiting godfather? Of course that is not what Justice Jackson meant at all. He was referring precisely to that "distinction between property contained in clothing worn by a passenger and property contained in a passenger's briefcase or purse."

*Id.* (quoting the dissent at 309-10.) We conclude this footnote in no way undermines the underlying command of the Fourth Amendment that searches and seizures be reasonable. "What is reasonable depends on the context within which a search takes place." *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985) (quotation

-9-

marks and citation omitted).

Focusing as we must on context, we are unwilling to extend the Court's *Houghton* automobile search analysis to a premises search for three reasons. First, the Court expressly limited its holding to "passengers' belongings found in the car that are capable of concealing the object of the search." *Houghton*, 526 U.S. at 307. The holding makes no mention of belongings found attached to the person, or property found on a premises. The *Houghton* holding is uniquely "grounded on a balancing of interests including a passenger's reduced expectation of privacy in containers placed in vehicles which 'trave[l] public thoroughfares.'" LaFave, *supra*, § 7.2, at 75 (quoting *Houghton*, 526 U.S. at 303).

Second, the majority's purpose in footnote one is to explain that its distinction "between searches of the person and searches of property" is not "'newly minted.'" *Id.* at 303 n.1 (quoting the dissent at 310). This distinction, rather than the *Houghton* dissent's passenger versus driver differentiation, is grounded in precedent and is the same one Justice Jackson relied on in *United States v. Di Re*, 332 U.S. 581 (1948). [6] *Houghton*, 527 U.S. at 303 n.1). When

_____

[6] In *Di Re*, the Court explained it was "not convinced that a person, by mere presence in a suspected car, loses immunities from *search of his person* to which he would otherwise be entitled." 332 U.S. at 587 (emphasis added).

-10-

reading the footnote in the context of the paragraph it supplements, the Court is merely differentiating between a search of personal property found in a car and a search of one's person, which is afforded heightened protection. *See id.* at 303. Therefore, we do not believe the Court is equating the scope of a container search in a vehicle to the scope of a container search in a home, particularly when the container is worn by an individual.

Finally, both the *Houghton* holding and footnote one do not address whether a purse worn by an individual constitutes part of the "'outer clothing,'" and thus a search of the person. *See id.* at 308 (Breyer, J., concurring) (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968) (noting the facts indicated the woman's purse "was found at a considerable distance from its owner" and detached from her person)).

Accordingly, we hold *Houghton* does not apply in this instance because its holding, footnote one, and facts are rooted in and inseparable from the context of the automobile exception, do not extend to a premises search, and are factually distinguishable from this case.

-11-

2.  Physical Possession and Relationship Analyses

Having decided *Houghton* is inapplicable to this appeal, we must now analyze the particular context of the search at issue.  The government suggests we limit our analysis to the premises search warrant that authorized the officers to search for keys, and the fact an officer could reasonably believe a purse could contain keys.  *See United States v. Gray*, 814 F.2d 49, 51 (1st Cir. 1987) ("[A]ny container situated within residential premises which [is] the subject of a validly issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant.").  The government cites *United States v. Gentry*, 642 F.2d 385, 387 (10th Cir. 1981), as support for its argument that a premises search warrant authorizes the opening of a container found on the premises where it is reasonable to believe the container could hold the object of the search.

In *Gentry*, we reasoned documentary evidence seized from an accomplice's briefcase was admissible because "[i]t is logical and reasonable that the drug, the object of the search, could be concealed in the briefcase situated on the premises.  A search of the briefcase would normally be appropriate under the warrant's authority."  642 F.2d at 387.  However, the facts in *Gentry* do not suggest the defendant, or even the accomplice, held the briefcase before, during, or after the

officers searched the premises. The briefcase was merely "situated on the premises." *Id.* Additionally, the officers in *Gentry* understood the accomplice's relationship to the defendant and knew that the accomplice who owned the briefcase was more than a mere visitor to the methamphetamine laboratory searched. Thus, the officer in *Gentry* did not improperly "assume[] that whatever is found on the premises described in the warrant necessarily falls within the proper scope of the search." *United States v. Micheli*, 487 F.2d 429, 431 (1st Cir. 1973). In this case, the government erroneously asks us to ignore that: (1) Karen Vogl was wearing her purse when the officers seized her and the purse; and (2) the officers did not know her relationship to the premises.

An examination of how other circuits resolve whether the container at issue is considered on the premises or an extension of a person reveals two different approaches. The first approach is a "physical possession" analysis. Under this inquiry, the reviewing court focuses on the physical location of the container and whether the individual wore the container at the time it was searched in order to determine whether the container was an extension of the person or part of the premises. *See United States v. Johnson*, 475 F.2d 977, 979 (D.C. Cir. 1973). For example, in *United States v. Teller*, the Seventh Circuit held the search of a purse was within the scope of the premises search warrant where the woman had placed

her purse on a bed and left the room during the search.  397 F.2d 494, 497-98 (7th Cir.), *cert. denied*, 393 U.S. 937 (1968).    The court concluded a purse that is temporarily put down cannot be considered an "extension of her person," and its search did not constitute a search of the person.    *Id.*  It logically follows that a purse within the individual's physical possession is considered an appendage of the body and, therefore, a search of the person.    *See Johnson*, 475 F.2d at 979 (noting the purse was not worn by defendant "and thus did not constitute an extension of her person so as to make the search one of her person");    *but see United States v. Branch*, 545 F.2d 177, 182 (D.C. Cir. 1976) (ruling the search of a bag worn by the defendant upon entering the premises was not permissible where the owner was unknown to police, entered the premises during the course of the premises search, and was not given an opportunity to leave).

Critics suggest this approach is both too broad and too narrow.  The rule provides blanket protection to those seeking to hide incriminating evidence because those individuals could avoid detection from lawful searches "through the simple act of stuffing it in one's purse or pockets."    *See United States v. Young*, 909 F.2d 442, 445 (11th Cir. 1990), *cert. denied*, 502 U.S. 825 (1991).  Similarly, the approach is too constrictive because "it would leave vulnerable many personal effects, such as wallets, purses, cases, or overcoats, which are often set down

-14-

upon chairs or counters, hung on racks, or checked for convenient storage."

*Micheli,* 487 F.2d at 431.

The second approach to determine whether the individual's container may be searched pursuant to a premises search warrant focuses on the officers' knowledge or understanding of the person's "relationship" to the premises searched at the time the officers executed the search warrant. *See United States v. Giwa*, 831 F.2d 538, 544 (5th Cir. 1987). In *United States v. Micheli*, the First Circuit rejected the "physical possession" test in favor of examining the relationship between the person and the place being searched. *Id.* at 431-32. Using this principle, the court concluded the usual occupant or owner of a premises being searched loses her privacy interest in the belongings located there; however, a "mere visitor" retains her legitimate expectation of privacy regardless of whether the visitor is currently holding or has temporarily put down her belongings. *Id.* at 432. Thus, the court upheld the search of the defendant's briefcase found under a desk because, as the co-owner of the business premises subject to the search warrant, he was not a mere visitor. *Id.* As a co-owner the defendant bore

> a special relation to the place, which meant that it could reasonably
> be expected that some of his personal belongings would be there.
> Thus, the showing of probable cause and necessity which was
> required prior to the initial intrusion into his office reasonably

comprehended within its scope those personal articles, such as his briefcase, which might be lying about the office. The search of the briefcase, under these circumstances, was properly carried out within the scope of the warrant.

*Id.*

In *United States v. Giwa*, the Fifth Circuit focused its inquiry on the officers' perception of the defendant's relationship to the place being searched.[7] 831 F.2d at 544-45. Under this analysis the officers' search of the flight bag was upheld because the defendant was an overnight visitor, he answered the door clad only in pants and a bathrobe, and was alone in the residence. *Id.* at 545. According to the court, these facts suggested defendant had "more than just a temporary presence in the apartment," and "the agents could reasonably believe his flight bag contained evidence" of the kind portrayed in the warrant. *Id*. at 544-45.

Critics suggest the "relationship" inquiry promotes inefficiency and uncertainty because it requires law enforcement officers to know the status of the

---

[7] The *Giwa* court suggested physical possession should not be the "sole criterion" in determining whether a personal item may be searched pursuant to a premises search warrant. 831 F.2d at 544. However, the court did not discuss how actual possession of the container factors into their analysis because the flight bag in question was located away from the defendant in a closet. *Id*. at 539-40, 545.

individual and who owns the container. *See Micheli*, 487 F.2d at 434 (Campbell, J., concurring). Such an approach obligates a court to inquire into the officer's subjective knowledge at the time of the search. *See id*. Additionally, because "the nature and quantum of 'relationship' cannot readily be defined, officers and courts may be bedeviled with uncertainty in a field where certainty is especially desirable." *Id*.

In this case, we find it unnecessary to decide which approach to adopt in order to resolve the issue on appeal because our conclusion is the same under either the "physical possession" or "relationship" inquiry. We begin with the physical possession analysis. The government disingenuously argues in its brief that Karen Vogl was not wearing or even holding her purse at the time the officers searched it. The government suggests the facts in this case are comparable to other "physical possession" cases that upheld searches when the purse was not worn by the defendant, because Karen Vogl's purse was situated on the porch floor rather than her shoulder. *See, e.g., Teller*, 397 F.2d at 497. However, the facts of this case are distinguishable from those cases because Karen Vogl did not voluntarily remove the purse from her person or abandon her interest in the purse by walking away from it. *Cf. Teller*, 397 F.2d at 497 (reasoning the purse is not an extension of the person when the individual, who is

not under arrest, puts the purse down and voluntarily walks away from it). Karen Vogl was wearing the purse when the officers seized it from her. We agree with the government's later contention in oral argument that the officer's action in dispossessing Karen Vogl of her purse is the "functional equivalent" of the purse being in her physical possession at the time of the search. Therefore, applying the "physical possession" test, we hold the officer's search of the purse in her physical possession was an unreasonable search in violation of the Fourth Amendment.

We turn our attention to the "relationship" inquiry to examine whether the officers knew, or inferred, Karen Vogl's relationship to the premises when they executed the search warrant. *See Giwa*, 831 F.2d at 544-45. The government recommends this court apply a "relationship" analysis, claiming "the agents executing the warrant knew that Karen Vogl was the wife of the principal target and that she lived in the house to be searched." Notably, however, the government offers nothing more than this conclusory statement to support its position. Absent a citation to record evidence in suppport of its claim, the government's bald assertion is factually insufficient in light of Agent Schacht's admission the officers did not know Karen Vogl existed on the date the search warrant was executed. In fact, she was not listed on the search warrant affidavit

or the subpoenaed electrical bills, the officers never observed her during their surveillance of the residence, and the officers' collective information referred only to Mr. Vogl. Moreover, Karen Vogl was not located within the residence at the time the officers encountered her; instead, she arrived immediately before or at the same time the officers arrived at the house, and was standing outside the premises in the driveway. *Cf. Giwa*, 831 F.2d at 545 (holding the defendant was more than a "casual visitor" because the officers found him inside the apartment alone and wearing only a bathrobe and pants).

The government also offers no evidence suggesting the officers inferred she occupied the premises. After reviewing the entire record, we believe the only evidence that could intimate the officers understood Karen Vogl's relationship to the premises is: (1) the officers' "contact[]" with her in the driveway as she stood holding the bags of groceries; (2) her possession of a large ring of keys which allegedly contained a key to open the door of the residence; and (3) her statement she wanted to read the search warrant before the officers entered.

First, the officers' "contact" with Karen Vogl consisted of approaching her, identifying themselves as officers, and explaining they possessed a federal search warrant for the premises. This one-sided communication does not establish the

officers inferred her relationship to the premises. DEA Special Agent Daniel Reuter suggested the officers "later identified" the woman in the driveway as Mrs. Vogl, but the government does not argue, and we find no mention in the record, that this identification occurred before or during the execution of the search warrant. Second, her possession of a reputed house key and agreement to open the door do not confirm the officers inferred she occupied the residence. The officer who took the keys from her could not find a key to open the door, she never opened the door, and the officers gained entry only by breaking the lock on the back door. Finally, her desire to read the search warrant and her possession of groceries fail to create an inference she lived at the residence, and we are unwilling to assume the officers perceived her as an occupant based on these actions. Her conduct would be typical for a casual visitor, including a neighbor, babysitter, or housekeeper. For the reasons stated, we hold the officers did not know, or infer, Karen Vogl's relationship to the premises when executing the premises search warrant, and we will avoid any attempt at judicial clairvoyance. *See Branch* , 545 F.2d at 182 ("[Defendant] was apparently a mere visitor; his relationship to the premises was not known, but was at best the subject of speculation."). Thus, the officer's search of Karen Vogl's purse was not authorized by the premises search warrant, and is therefore in violation of the Fourth Amendment.

We hold the officer's search of Karen Vogl's purse, when viewed under either the "physical possession" or the "relationship" analysis, violated the Fourth Amendment. We **AFFIRM** the district court's grant of Karen Vogl's motion to suppress the key.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge